NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTEC-TION AND ACTING ADMINISTRATOR, NEW JERSEY SPILL COMPENSATION FUND, PLAINTIFFS–APPELLANTS, v. OFRA DIMANT, RITA LAPINSKI, CHARLES ZACCARDI, EVELYN M. ZACCARDI, GARY C. ZACCARDI, MICHAEL ZACCARDI, AND ZACCARDI'S CLEANERS, A NEW JERSEY PARTNERSHIP, DEFENDANTS, AND CHOUCHAN SAMMAN, RIAD SAMMAN, AND SUE'S CLOTHES HANGER, INC., DEFENDANTS/THIRD-

PARTY PLAINTIFFS–RESPONDENTS, v. BHARAT K. SHAH, PRITI B. SHAH, AND PTR, PTB, PTM CORP., THIRD–PARTY DEFENDANTS–RESPONDENTS, AND LOUIS SCHARLAT, CONCHETTA SCHARLAT, ANTHONY CHIRICO, DONALD H. HICKMAN, FLOYD S. RANDOLPH, AND CLEANING VILLAGE OF SOMERSET, INC., THIRD–PARTY DEFENDANTS.

Argued May 7, 2012—Decided September 26, 2012.

158

Richard F. Engel, Deputy Attorney General, argued the cause for appellants (Jeffrey S. Chiesa, Attorney General of New Jersey, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Mark D. Oshinskie, Deputy Attorney General, on the briefs).

George R. Hardin argued the cause for respondent Sue's Clothes Hanger, Inc. (Hardin, Kundla, McKeon & Poletto, attorneys; Mr. Hardin, Arthur A. Povelones, Jr., and James P. Krupka, on the briefs).

Jacob S. Grouser argued the cause for respondents Bharat K. Shah, Priti B. Shah, and PTR, PTB, PTM Corp. (Hoagland, Longo, Moran, Dunst & Doukas, attorneys).

Keith E. Lynott argued the cause for amici curiae New Jersey Chamber of Commerce and Commerce and Industry Association of New Jersey (McCarter & English, attorneys; Mr. Lynott and J. Forrest Jones, on the brief).

Steven J. Picco submitted a brief on behalf of amici curiae Fuel Merchants Association of New Jersey and Chemistry Council of New Jersey (Saul Ewing, attorneys; Mr. Picco, Andrea A. Lipuma and Deborah L. Shuff, on the brief).

William J. Schulte submitted a brief on behalf of amici curiae Food and Water Watch, Inc., and Raritan Riverkeeper, Inc. d/b/a New York/New Jersey Baykeeper (Eastern Environmental Law Center, attorneys; Mr. Schulte and Alice R. Baker, on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

Seeking contribution for costs expended in the investigation and remediation of contaminated groundwater that tainted private wells in Bound Brook, the New Jersey Department of Environmental Protection and the Administrator of the New Jersey Spill Compensation Fund (hereinafter collectively the DEP), filed this action under the Spill Compensation and Control Act (Spill Act or Act). Although the DEP named several defendants in its complaint, and third-party complaints were filed thereafter, by the time of trial the only direct defendant remaining in the DEP's case was Sue's Clothes Hanger (Sue's).[1]

After a bench trial, the court found that the DEP failed to prove by a preponderance of the evidence that any discharge by Sue's caused the groundwater contamination in issue. Absent such a nexus, the court held that the DEP could not compel contribution by Sue's under the Spill Act for investigation, cleanup, or damages caused by the contaminated groundwater. Accordingly, the court dismissed the claim. The Appellate Division affirmed, expanding on the trial court's reasoning in a published opinion. *N.J. Dep't of Envtl. Prot. v. Dimant*, 418 *N.J.Super.* 530, 14 *A.*3d 780 (2011).

The DEP petitioned this Court, claiming that the trial and appellate courts misperceived the nexus required for liability under the Spill Act. The DEP argues that by imposing a common law causation standard for damages, the Appellate Division panel's decision in this matter has unsettled the law governing the liability

---

[1] The DEP also named as defendants, among others, Mr. and Mrs. Samman, who were directors and operators of Sue's, Rita Lapinski, the owner of the building where Sue's was located, Zaccardi's Cleaners (Zaccardi's), and the individual operators of Zaccardi's. Third-party actions were filed; notably, the prior owners and operators of Sue's—Mr. and Mrs. Shah—were impleaded by Sue's. However, the DEP did not assert direct actions against any third-party defendant until days after the trial had commenced. Due to the prejudice caused by the DEP's delay in proceeding with this matter, the court denied the DEP's motion to add direct claims. Prior to trial, the DEP settled with Zaccardi's and its operators, and with Lapinski. The Sammans filed for bankruptcy and received a judgment of discharge.

of dischargers under the Spill Act for hazardous-substance spills. We granted certification, 208 *N.J.* 381, 30 *A.*3d 318 (2011), and now affirm, with slight modification to the analysis. We specifically affirm the Appellate Division's judgment that found that the DEP's proofs failed to demonstrate a sufficient nexus to impose on Sue's any contribution obligation for this groundwater contamination. The DEP needed to demonstrate a nexus between the discharge proved to be committed by Sue's during its period of operation and the groundwater contamination in issue. Although we accept the trial court's determination that the DEP's proofs fell short of demonstrating such a connection between the discharge committed by Sue's and the groundwater contamination, we clarify that the Spill Act does not require proof of the common law standard of proximate-cause causation of specific environmental damage as a precondition to relief under the Act.

## I.

We begin with a brief description of the landmark legislation that provides the framework for this matter.

In 1976, the New Jersey Legislature passed the Spill Act, which "was a pioneering effort by government to provide monies for a swift and sure response to environmental contamination." *Marsh v. N.J. Dep't of Envtl. Prot.*, 152 *N.J.* 137, 144, 703 *A.*2d 927 (1997). Since its enactment, other states, as well as the federal government, have passed similar legislation. *Ibid.; see, e.g.,* Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 *U.S.C.A.* §§ 9601 to 9675. That said, the Spill Act was unique when enacted. It was the most comprehensive spill cleanup program in the nation. *See Governor's Press Release for Assembly Bill No.1903 ("Governor's Press Release ")*, at 1 (Jan. 6, 1977).

The specter of a massive offshore oil spill provided the initial impetus for the Spill Act. *Buonviaggio v. Hillsborough Twp. Comm.*, 122 *N.J.* 5, 7–8, 583 *A.*2d 739 (1991).[2] The express purpose of the Act was

---

[2] In the 1970s, oil corporations experiencing the effects of a Middle East oil embargo began contemplating supertanker ports and exploratory drilling off the

to exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damaged by such discharges....

[*N.J.S.A.* 58:10–23.11a.]

The Legislature directed that the Act "be liberally construed to effect its purposes," *N.J.S.A.* 58:10–23.11x, which include protection of the public health, safety, and welfare, *ibid.*, protection and preservation of the state's land, waters, and natural resources, *N.J.S.A.* 58:10–23.11a, and ensuring that polluters bear the costs of cleanup efforts, *see In re Kimber Petroleum Corp.*, 110 *N.J.* 69, 90, 539 *A.*2d 1181 (1988) (Wilentz, C.J., dissenting). Those general purposes find their parallels in broadly worded key operative provisions within the Act.

The Spill Act strictly prohibits the discharge of hazardous substances, *N.J.S.A.* 58:10–23.11c, and defines a "discharge" as

any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State....

[*N.J.S.A.* 58:10–23.11b.]

By covering acts and omissions, and by including many verbs describing the manner in which a hazardous substance might reach land or water, the category of what constitutes a "discharge" is self-evidently broad. Decisional law has delimited the outer contours of a discharge only to some degree. *See, e.g., White Oak Funding, Inc. v. Winning*, 341 *N.J.Super.* 294, 299, 775 *A.*2d 222 (App.Div.) (holding that discharge did not occur when

coast of New Jersey. *Buonviaggio, supra,* 122 *N.J.* at 8, 583 *A.*2d 739. In response to the tourist industry's concern that an oil spill from such activities could lead to the ruination of the recreational and tourism business interests in the renowned Jersey Shore, the Legislature passed the Spill Act. *See ibid.; see also* Assemb. 1903 (*Sponsors' Statement*), 197th Leg. (N.J. 1976); S. 1796 (*Sponsors' Statement*), 197th Leg. (N.J. 1976).

hazardous substance, already present in water or soil, merely migrates through that medium), *certif. denied,* 170 *N.J.* 209, 785 *A.*2d 437 (2001); *Atlantic City Mun. Utils. Auth. v. Hunt,* 210 *N.J.Super.* 76, 96, 509 *A.*2d 225 (App.Div.1986) (holding that placement of waste into non-leaking containers does not constitute "a discharge").

*N.J.S.A.* 58:10–23.11g(c)(1) establishes a broad scope of liability under the Spill Act:

[A]ny person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department or a local unit. . . .

Like CERCLA, the enactment of which followed the Spill Act, the Act has a "superfund" from which the State can pay for cleanup in emergency situations and for cleanup of abandoned sites where no responsible parties can be identified. *See Buonvi-aggio, supra,* 122 *N.J.* at 7–10, 583 *A.*2d 739 (discussing Spill Fund). Although the Spill Act did not establish a defined set of potentially responsible parties (PRPs)—the approach taken later in CERCLA—case law interpreting the statute has generated a list of PRPs.[3] If responsible parties fail to participate in the cleanup, the Spill Act permits the DEP to recover three times the amount expended in cleaning the contaminated site. *N.J.S.A.* 58:10–23.11f(a)(1). The "cleanup and removal costs" for which an entity becomes liable include "all direct costs," and certain "indirect costs," that are "associated with a discharge." *N.J.S.A.* 58:10–23.11b.

---

[3] The Spill Act was amended in 1993 and 1997 in response to judicial interpretation. *See L.* 1997, *c.* 278; *L.* 1993, *c.* 112. However, those amendments did not eliminate the Spill Act's imposition of joint and several liability on former and current owners. Rather, the amendments clarified that neither holders of security interests who do not participate in the management of a property nor fiduciaries of trusts which own property are responsible for discharges of hazardous substances from those properties. *See N.J.S.A.* 58:10–23.11g4 to g9.

With those key provisions in mind, we turn to the record in this matter.

## II.

### A.

The following facts provided the basis for the trial court's conclusions, and are not disputed on appeal.

In 1988, samples from scores of residential wells in Bound Brook revealed contaminated groundwater. The primary contaminant was perchloroethylene or tetrachloroethylene (PCE or PERC),[4] a compound used in the dry cleaning industry and as a degreaser in automobile and machine shops. PCE is a volatile organic chemical compound that evaporates quickly when exposed to air and dissolves when mixed with water.

The investigation into the source of the contaminants focused on various businesses, and ultimately concentrated on Sue's and Zaccardi's. Sue's dry cleaning store was part of a three-unit strip mall that had been the location of a laundry and dry cleaning business since the 1950s. The contaminated wells were all located south and southeast of a cluster of buildings on West Union Avenue where were located Sue's, the next-door Zaccardi's, and, on the other side of Sue's, a former Mobil gas station. Also in the vicinity were a Chevrolet dealer and two other dry cleaners, Michael James Cleaners (Michael James) and Bound Brook Cleaners.

Third-party defendants, the Shahs, operated the business that became Sue's from 1985 to 1987. In addition to running a laundromat, the business had two small dry cleaning machines. The Shahs' operation used the dry cleaning machines in a "closed

---

[4] Trichloroethylene (TCE), dichloroethylene (DCE), chloroform, benzene, and xylene also were discovered in the well water. TCE and DCE are degradation byproducts of PCE and, also, are used as dry cleaning agents, metal degreasers, refrigerants, and solvents for fats and paints.

loop" system. The machines used PCE, of which some was absorbed by the clothing, some evaporated, and the rest fell into a reservoir under the machine. An exterior pipe vented heat generated during the drying process.

In May 1987, the Shahs sold the business to the Sammans, who changed its name. The Sammans ran Sue's as a self-serve laundromat, but beginning in December 1987 they also operated the dry cleaning machines a few times per week, to process dropped-off laundry, for approximately fifteen months. Whereas Sue's had a relatively small dry cleaning operation during that stretch of time, the next-door Zaccardi's had long been operating, and still was at the time of trial, as a full-service dry cleaner that utilizes PCE.

In December 1988, a health inspector, Ms. Key, accompanied by two DEP investigators, visited a number of businesses, including Michael James, Zaccardi's, and Sue's, as part of the inquiry into the source of well contamination. Samples were not taken from Michael James because the operator denied using PCE or having a discharge problem. Later it was determined that Michael James had a number of leaking underground tanks, including one containing "solvent." [5] Fluid samples taken from a discharge pipe at Zaccardi's revealed the presence of PCE and other contaminants.

At Sue's, fluid samples were taken from two locations. The first was a pit near the floor of the dry cleaning machines. The sample registered 195,000 parts per billion of PCE, and under New Jersey regulations the maximum permissible contamination level is one part per billion. However, tests demonstrated that the indoor pit, from which that sample was taken, was not leaking and thus it was determined that that location could not be a source of the PCE discharged into the environment. The second sample was taken from a pipe protruding from Sue's to the building's

[5] The trial court's decision does not indicate whether this solvent may have contained PCE, although it appears that the court assumed it did.

exterior. The leakage from that pipe is the sole asserted instance of Sue's contribution to environmental contamination.

The pipe's opening was approximately five feet above the ground; it emitted a slowly dripping liquid onto driveway pavement directly below.[6] After hitting the pavement below the piping, the liquid would flow in a direction away from the building. The leakage from the pipe registered a contamination level of more than 3,000 parts per billion of PCE, which constitutes more than 3,000 times the maximum contaminant level. The DEP investigators observed the drip only on that one occasion, and never returned to retest the pipe or to photograph it. Thus, the trial court noted that "there was no evidence that the pipe continued to drip or, if it did continue to drip, how frequently it dripped, or, if it did drip, where the drip went." The court found it significant that the tester of the pipe could not recollect whether the pavement under the drip was cracked or eroded, noting that because PCE is "a chlorinated solvent, [it] will break down the oils in asphalt and cause it to crumble." Additionally, the court explained that as a volatile organic compound, PCE is prone to quick volatilization/evaporation when exposed to air, and observed that the record contained no evidence "indicating that the PCE in the dripping fluid did or did not volatize once the fluid struck the pavement." Regardless, any PCE drip by Sue's and the Sammans had to have ended by early 1989, because Sue's discontinued its use of the dry cleaning machines at or prior to that time.

In 2000, more than ten years after the investigation into the source of the well water contamination, the DEP assigned to a staff geologist, Ms. Vogel, the task of preparing a report on the groundwater contamination and its sources. She concluded that

---

[6] Although the trial court did not make a finding as to the exact rate of dripping, the DEP asserts before this Court that the pace of the dripping was swift enough to allow the investigator to fill two forty-milliliter jars over the course of several minutes. The portion of the record cited for that proposition does not specifically support the assertion; however, the rate of dripping asserted by the DEP is not a contested point in this appeal.

Zaccardi's and Sue's were the sources of PCE contamination of the affected wells. In support of her conclusion, Vogel testified that the highest contamination levels were all clustered in an area directly behind the two dry cleaners.

She noted that although Sue's operated the dry cleaning machines from December 1987 to early 1989, the property operated by Sue's had used dry cleaning machines dating as far back as the 1950s, though not continuously. Although unequivocal that dry cleaning operations at the site of Sue's had caused contamination, she did not make a determination as to which operator was the cause of the contamination. She conceded that she had not specifically determined that the Sammans caused the contamination during their period of dry cleaning operations at Sue's or whether it occurred solely while prior operators ran the Sue's site.

With respect to Zaccardi's, Vogel testified with greater certitude. She concluded that Zaccardi's had contributed to the contamination because there was evidence of a pipe protruding from Zaccardi's that was discharging PCE-laden fluid onto degraded pavement that was cracked and eroded. Vogel could not point to similar proof of asphalt degradation at Sue's when test samples showing PCE were taken from the dripping outdoor pipe.

The court also heard conflicting testimony from experts about the direction of groundwater flow. Ultimately, the court found the evidence presented to be inconclusive. The DEP's expert testified that the flow was southeasterly, which supported the theory that the contamination to the southeast of Sue's and Zaccardi's was caused by those establishments. Sue's expert argued that the flow was southwesterly and that therefore the property on which Sue's was located could not have been the source of the PCE. Consistent with that groundwater-flow theory, the nearby Mobil station was identified as the likely origin of the contamination.

Although the trial court found that the groundwater flowed generally in a direction to the south and southwest, it noted that groundwater flow is idiosyncratic and often moves irregularly.

The court refrained from conclusively determining the direction in which these contaminants must have been migrating over time, finding that it was unnecessary to decide between the experts' opinions. The court explained that even "assum[ing] that the Lapinski building [7] is a source of the groundwater contamination, the evidence, both direct and circumstantial, is insufficient to establish that [Sue's] discharged PCE which contaminated the groundwater."

In support of its determination, the court summarized its findings as follows:

1. The groundwater contamination at issue preceded this defendant's dry cleaning operation;

2. Similarly, the contaminated soil found on the Lapinski property, of a low level, was contaminated prior to defendant's dry cleaning operation;

3. The PCE found in the pit behind the dry cleaning machines inside defendant's store was not a source of a groundwater contamination. The dye test established that this material went into the sanitary sewer system and not into groundwater. The dye test also established that dye did not appear in any of the affected wells;

4. The drip from the outside pipe at defendant's store was not re-tested. There is no evidence that the drip was continuous or intermittent. As distinguished from the Zaccardi building, there is no evidence that the pavement at defendant's establishment onto which the drip flowed showed any signs of PCE contamination through cracking or erosion of the asphalt;

5. The fact that the DEP or Ms. Key took no other action regarding the outside drip after Ms. Key took her initial sample is circumstantial evidence that the DEP did not consider the drip to be of significance regarding its investigation of the source of the groundwater contamination;

6. There were dry cleaning operations at the Lapinski building since the 1950s unrelated to the defendant's operation. There is no evidence that the PCE in the groundwater or soil at the Lapinski premises came, even in part, from this defendant's operation rather than from the other persons or entities who operated dry cleaning establishments on the Lapinski property over a four decade period. In this regard, the court restates its findings, based on Vogel's testimony, that the well-contamination preceded defendant's dry-cleaning operation;

7. Plaintiff's primary witness, Ms. Vogel, was unable to establish or identify the source of the PCE that contaminated the groundwater in light of the history of

[7] The trial court referred to the building in which Sue's was located as "the Lapinski building" or "the Lapinski property."

dry cleaning operations at the Lapinski building. Because there are other alternative sources of PCE contamination from the Lapinski building, as well as from Zaccardi's, the plaintiff has not established by a preponderance of the evidence that this defendant contributed to contamination of the groundwater.[8]

Accordingly, the court dismissed the DEP's Spill Act claim against Sue's as well as all other counts in the complaint.

### B.

The DEP appealed and the Appellate Division affirmed the judgment of the trial court. *Dimant, supra,* 418 *N.J.Super.* at 535, 14 *A.*3d 780. The panel characterized the DEP's argument as asking that "the Spill Act ... be interpreted and applied very broadly to find that any discharge at any time, even a de minimis one, imposes liability on all operators handling that product, and that a direct causal connection between the discharge and the damages need not be established." *Id.* at 542, 14 *A.*3d 780. The panel rejected that posited interpretation, explaining that Spill Act liability requires proof of a nexus between a discharge and damages resulting from that discharge. *Id.* at 544–45, 14 *A.*3d 780.

Addressing the evidence proffered by the DEP in this matter, the panel explained:

Plaintiffs make much of the fact that PCE was found in the soil and groundwater samples taken at defendant's store in 2000, twelve years after the first sampling in 1988. They then speculate that the 1988 discharge from the outside pipe could have flowed across the driveway onto the soil or leaked into the groundwater through unseen cracks in the asphalt, or that the inside discharge could have found its way into the groundwater through cracks in the sewer pipes. These intimations, however, were not established by the evidence. There was no proof, for

---

[8] That finding of the trial court appears to have been based in part on testimony offered by Sue's expert witness, Mr. Mulhall. Mulhall testified that, given the chemical properties of PCE and the soil conditions surrounding the Lapinski property, it would not have been possible for a discharge of PCE from Sue's to have reached the groundwater at the time the DEP detected its presence in Bound Brook wells. Mulhall posited instead that the trace levels of PCE found in soil borings taken near the Lapinski property in 2000 were consistent with an upward migration of volatizing PCE from the groundwater into the soil beneath Sue's, which could only have occurred if another site was responsible for the groundwater contamination.

example, that defendant's asphalt driveway was cracked or eroded, or that the contaminated discharge did not evaporate soon after hitting the asphalt and before getting into the soil or groundwater. Moreover, DEP representatives never retested the outside "drip" and there was no indication that the pipe continued to drip or, if it did, where the drip went after striking the pavement.... As properly found by the trial judge, the circumstances are devoid of the critical factor that triggers Spill Act liability, namely that defendant must be in any way responsible for the discharge that *caused* the contamination.

[*Id.* at 545, 14 *A.*3d 780.]

## III.

### A.

The DEP contends that the undisputed evidence of Sue's PCE discharge, combined with the fact that the highest concentrations of PCE in the area were found in the groundwater beneath Sue's property, create the necessary causal nexus to impose liability under the Spill Act, and claims the panel was led astray by two errors.

First, it asserts that the trial court required proof of typical common law causation rather than the appropriate, and more liberal, nexus requirement found in the Spill Act and related case law interpreting and applying the Act's imposition of strict liability. The DEP contends that because there is sufficient evidence here to show a nexus between the discharged PCE and its appearance in the environment, causation is met and Sue's should be strictly liable. The DEP argues that several inapt concerns were injected into the causal analysis in this matter, such as the duration of time that the pipe at Sue's was leaking, whether other parties may also have discharged PCE in the area, the low amount of PCE directly observed to have been discharged, and the DEP's delay in pursuing cost recovery. Characterizing those as irrelevant equitable considerations, the DEP argues that proven discharge at the site of contamination is sufficient to meet the nexus test.

Second, the DEP contends that the Appellate Division mistakenly created a de minimis standard for avoiding liability, contrary

to the plain language of the statute and our holding in *Marsh, supra,* that there is no de minimis exception to the Spill Act. *See* 152 *N.J.* at 150, 703 *A.*2d 927. In addition to claiming that the Appellate Division decision implies that de minimis discharges should receive different treatment, the DEP points to the court's emphasis on the short time that Sue's operated the business and whether there were cracks in the driveway beneath the dripping pipe. The DEP argues that in focusing on those factors in the causal analysis, the Appellate Division decision essentially permits de minimis discharges. Furthermore, the DEP maintains that the Appellate Division misread the Spill Act's definition of what constitutes a discharge when it determined that discharges can only occur "when damage may result." As the DEP reads the Act, the damage clause in the definition of a "discharge" should apply only to discharges that occur in waters outside of the state.

## B.

Respondents, Sue's and the Shahs,[9] principally argue that the Appellate Division did no more than affirm the finding of the trial court that the DEP failed to sustain its burden of showing, by a preponderance of the evidence, that any discharge stemming from Sue's was a source of the groundwater contamination at issue. They assert that both courts utilized the appropriate nexus test for causation and found that the DEP had failed to prove any connection between the PCE discharged by Sue's dripping pipe and the PCE that reached and contaminated the groundwater at issue. They contend that the DEP seeks to eliminate the requirement that there be some causal connection between a discharge and the contamination that results in response costs. Furthermore, respondents assert that although the Appellate Division

---

[9] The Shahs are a party in interest because they are third-party defendants to Sue's who could share in any assessment of liability against Sue's. That said, the Shahs note, correctly, that the DEP did not seek review of the portion of the trial court's decision, affirmed by the Appellate Division, denying the DEP's attempt to name them as direct defendants.

noted the de minimis nature of Sue's discharge, contrary to the DEP's assertions, the panel did not ground its ruling on any notion of a de minimis exception to liability.

## C.

In sum, on the issue of causation, all parties agree that some "nexus" must be shown for Spill Act relief to be available.[10] However, they dispute the nature of the nexus. The Appellate Division concurred with respondents that the DEP must demonstrate a causal nexus between a discharge and environmental damage. *Dimant, supra,* 418 *N.J.Super.* at 545, 14 *A.*3d 780. The DEP contends that it is sufficient to show a nexus between the substance discharged and "its appearance in the environment" to warrant relief under the Spill Act. Although the Appellate Division appears to have assumed that there was a discharge at Sue's, the panel's analysis and its conclusion that Sue's is not liable under the Spill Act were informed by its assertion that a "discharge" can only occur where there is resultant "damage." *Id.* at 544, 14 *A.*3d 780. Accordingly, we begin with an examination of the Spill Act's definition of a discharge.

## IV.

■ A discharge occurs pursuant to *N.J.S.A.* 58:10–23.11b when a hazardous substance is spilled or leaked, or otherwise released, "into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the . . . State." The Appellate Division understood the "when damage may result" clause to be a requirement pertaining to all spills and leaks. *Dimant, supra,* 418 *N.J.Super.* at 544, 14 *A.*3d 780. However, the

---

10 The Appellate Division noted that New Jersey cases had not explicitly stated that a direct causal link was required, but found the "nexus" requirement to be "implicit" in the holdings of cases that have discussed the Spill Act. *Dimant, supra,* 418 *N.J.Super.* at 544, 14 *A.*3d 780.

DEP contends that that reference to damage to the state's land, waters, or natural resources is required for proof of an actionable "discharge" only when the original spill or leak occurred in waters outside of the state. The grammar of the sentence supports the DEP's reading; if damage were required in all instances, there would be a comma in the provision immediately after the words "jurisdiction of the State." *See N.J.S.A.* 58:10–23.11b. According to the DEP, the presence of such a comma would have made the two distinct types of spill or leak both subject to the damage limitation; however, because the provision lacks such a comma, it creates two separate occurrences that qualify as discharges: (1) a spill or leak "into the waters or onto the lands of the State"; or (2) a spill or leak "into waters outside the jurisdiction of the State when damage may result" inside the state. *See ibid.*

Such a plain reading of the sentence's structure has substantial logical force: any spill within the state constitutes a discharge subject to potential reaction under the powers authorized pursuant to the Spill Act. That would be the case whether the action that is sought be injunctive, to stop the release of the hazardous material wherever in the state it occurs; investigative, to identify all sources of a contaminant or contaminants affecting the environment in New Jersey; or remedial, to clean up any damage to the New Jersey environment. Further, any such intra-state discharge results in the imposition of strict liability, under the Spill Act, for the private party or parties responsible for the discharge. But when a spill occurs outside the state's boundaries, there must be damage within the state's land and waters for the spill to invoke similar reaction, and strict liability, under the Spill Act in New Jersey. *Cf. In re Adoption of N.J.A.C. 7:26B*, 128 *N.J.* 442, 453, 608 *A.*2d 288 (1992) ("Spill Act defines discharge as action or inaction resulting in release of hazardous substance subject to subsequent migration, including from one jurisdiction to another." (citing *N.J.S.A.* 58:10–23.11b(h))). A statement issued by Governor Byrne immediately following the enactment of the Spill Act supports that reading. *Governor's Press Release, supra,* at 2 ("The bill covers spills and discharges anywhere in New Jersey

... and also protects against any spills taking place outside the state which could cause damage in New Jersey."). As noted, it was the specter in the 1970s of a massive offshore oil spill due to the anticipated presence of supertankers and drilling off the coast of New Jersey that prompted passage of the Spill Act. *See Buonviaggio, supra,* 122 *N.J.* at 7–8, 583 *A.*2d 739. The legislation appears to have been designed to address sources of harm that *risked damage* to New Jersey land and water and provided for injunctive and other relief even before the damage completed its migration to New Jersey lands and water.[11] *N.J.S.A.* 58:10–23.11b, –23.11g(c)(1).

■ The better of the two interpretations of the statute supports a conclusion that Sue's committed a "discharge." It operated a business where, on at least one occasion, an exterior building pipe emitted an uncontrolled drip of fluid with a high concentration of PCE onto the ground. Thus, its actions "result[ed] in the ... leaking ... of hazardous substances ... onto the lands of the State." *See N.J.S.A.* 58:10–23.11b. That there was asphalt between the soil and the drip makes no difference in terms of whether this constituted a release of hazardous substances: the fluid was leaking into open air space under which there was no structure to contain it.

■ There is plainly no de minimis exception to the Spill Act's prohibition against the discharge of a hazardous substance. *See*

---

[11] That said, the Sponsors' Statement contains some sweeping statements that could be read to suggest that the "when damage may result" clause in the definition of a discharge might have been meant to apply to spills both inside *and* outside the State. *See* S. 1409 (*Sponsors' Statement* ), 197th Leg. (N.J. 1976) (stating that Act "establishes liability without fault for damages within the State resulting from spills ... occurring both within and outside the State's jurisdiction"). However, when viewed against the backdrop of the Spill Act's overall legislative scheme aimed at protecting and preserving the lands and water of the State, and giving a plain reading to the language of the sentence, the "when damage may result" language appears better understood to have been inserted to signal that an out-of-state spill that realistically may impact New Jersey's natural resources can trigger Spill Act liability.

*Marsh, supra,* 152 *N.J.* at 150, 703 *A.*2d 927 (rejecting possibility of "de minimis" discharge exception to application of Spill Act, but expressing expectation that DEP would not arbitrarily exercise authority against persons for minimal discharges); *Universal–Rundle Corp. v. Commercial Union Ins. Co.,* 319 *N.J.Super.* 223, 240–41, 725 *A.*2d 76 (App.Div.) (noting *Marsh*'s conclusion as to lack of existence of "de minimis exception" to Spill Act's application), *certif. denied,* 161 *N.J.* 149, 735 *A.*2d 574 (1999). Indeed, one could not reasonably assert that, on finding that exterior pipe at Sue's openly dripping fluid containing in excess of 3,000 times the permitted level of PCE, the DEP would have lacked authority under the Spill Act to seek injunctive relief to order the cessation of that hazardous substance drip, *see N.J.S.A.* 58:10–23.11u(b)(1), or to have ordered, at the time, at least a preliminary assessment and site investigation, *see N.J.A.C.* 7:26E–3.1 to –3.14.

Although the Appellate Division ultimately grounded its holding rationale separate from a lack of a "discharge," its construction of the "discharge" definition to require proof of soil or water damage whether the discharge occurs within or without the geographic boundaries of New Jersey was erroneous. We provide this clarification to eliminate any misperception about the authority of the DEP and other third parties to react to an in-state discharge of a hazardous substance through resort to the powers available under the Spill Act.

That said, the determinative question is not whether there was a discharge at Sue's but whether the DEP has connected the discharge that did occur to the relief it has sought against Sue's. As to that, the findings of the trial judge set the boundaries of our analysis on these facts. *See Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974).

V.

The complaint in this matter focused on contamination of groundwater in Bound Brook. As pled, that was the affected natural resource for which the DEP sought cleanup and removal

costs and damages, as well as funding for compensatory restoration of the natural resources injured as a result of the discharge of hazardous substances at the Lapinski and Zaccardi sites. That request for relief focuses our review of these proofs, just as it did for the courts that heard this matter before us. We focus on the proofs regarding the alleged discharger first, and then turn to the proofs connecting that discharge to the contaminated natural resource.

## A.

The legislative history of the Spill Act, and case law interpreting the Act, establishes that the discharge of hazardous waste by an operator must be tied to the discharge by that operator and not another. When codifying its intent in passing the Spill Act, the Legislature stated its purpose "to provide liability for damage sustained within this State *as a result of* any discharge of said substances." *N.J.S.A.* 58:10–23.11a (emphasis added). The Spill Act provides that one who is "in any way responsible for any hazardous substance" is strictly liable, upon its discharge, for "all cleanup and removal costs no matter by whom incurred." *N.J.S.A.* 58:10–23.11g(c)(1).

Legislative history on the Spill Act phrase "in any way responsible" reveals that the Legislature added it in 1979 when it amended the strict-liability provision to provide for joint and several liability under the Act. *See L.* 1979, *c.* 346, § 5. No longer was liability limited to those who were active participants in the discharge of hazardous substances. *See Marsh, supra,* 152 *N.J.* at 146, 703 *A.*2d 927 (finding legislative intent to expand scope of Spill Act liability through 1979 amendments that hold strictly liable any owner or operator who was "in any way responsible" for discharge and citing, in support, *State, Dep't of Envtl. Prot. v. Ventron Corp.,* 94 *N.J.* 473, 502, 468 *A.*2d 150 (1983) (noting that while subsequent acquisition of property on which spill had occurred is insufficient to impose responsibility, one who owns or controls

property at time of discharge is responsible party for Spill Act purposes)).

Similarly, the contemporaneous Sponsor's Statement characterizes the 1979 amendment as removing strict liability defenses and providing for joint and several liability for a broader class of responsible parties. Assemb. 3542 (*Sponsor's Statement*), 198th Leg. (N.J. 1979); *see also N.J.S.A.* 58:10-23.11f(a)(2)(a) (providing to one who has cleaned up "a discharge" right to seek contribution from other dischargers and from those "in any way responsible for a discharged hazardous substance"); *cf. Kimber, supra,* 110 *N.J.* at 90, 539 *A.*2d 1181 (Wilentz, C.J., dissenting) ("Moreover, liability is 'joint and several.' Anyone 'in any way responsible' for the discharge that ultimately poisons a site is liable for all cleanup and removal costs."). This perspective on the available legislative history comports with the approaches taken in *Ventron, Kimber,* and *Marsh*—the cases cited by the Appellate Division to support a nexus requirement—which concerned the distinctly separate question about holding liable a party who was not directly responsible for the discharge that had occurred, but who nevertheless had some control over the direct discharger in each matter.

In *Ventron, supra,* the parties did not dispute the source of contamination, or whether the offending discharge caused damages, and, thus, we did not address any particular nexus, link, or connection between a discharge and damages. *See* 94 *N.J.* at 482, 468 *A.*2d 150 ("The contamination at Berry's Creek results from mercury processing operations carried on at the site for almost fifty years."). Our discussion of the phrase "in any way responsible" arose in the context of a parent corporation's liability for contamination caused by its subsidiary's operations. *See id.* at 483, 502, 468 *A.*2d 150. There was similarly no factual dispute in *Kimber* about the source of the gas leak or cause of the groundwater pollution; the contamination was "traced" to two gas stations. *See Kimber, supra,* 110 *N.J.* at 72, 539 *A.*2d 1181. And, in *Marsh,* the Court discussed the phrase "in any way responsible" in the context of a purportedly "innocent landowner" who was unaware

that she had an underground tank still emitting petroleum pollutants when she took title to her property. *See Marsh, supra,* 152 *N.J.* at 146–47, 703 *A.*2d 927. Indeed, in the present matter, the appellate panel acknowledged that *Ventron, Marsh,* and *Kimber* were concerned with the meaning of "in any way responsible" in the context of ownership and control. *See Dimant, supra,* 418 *N.J.Super.* at 543–44, 14 *A.*3d 780.

■ Nevertheless, *Ventron, Kimber,* and *Marsh* underscore the important point that the phrase "in any way responsible" requires some connection between the discharge complained of and the alleged *discharger*—in *Ventron* and *Kimber,* the parent companies, and in *Marsh,* the subsequent landowner one of whose underground tanks still leaked during her ownership. That nexus is what ties the discharger to the discharge that is alleged to be the, or a, culprit in the environmental contamination in issue.

## B.

■ Once a party is found responsible for a discharge, there is another requirement to be satisfied. A nexus also must be demonstrated to exist between the discharge for which one is responsible—in any way—and the contaminated site for which cleanup and other related authorized costs are incurred. *See N.J. Tpk. Auth. v. PPG Indus.,* 197 *F.*3d 96, 106 (3d Cir.1999) (citing *Ventron, Kimber,* and *Marsh* to clarify that notwithstanding Spill Act's strict liability standard, plaintiff still required to prove some nexus between offending discharge and site for which cleanup and related costs are incurred).

Several provisions of the Spill Act support this principle. When defining when, and what, costs would be shifted to a proven discharger of a hazardous substances, *N.J.S.A.* 58:10–23.11b states that "cleanup and removal costs" are costs *"associated with* a discharge." (Emphasis added). Further, in *N.J.S.A.* 58:10–23.11g(a), which defines the scope of "direct and indirect damages" for which the Spill Fund is strictly liable, various provisions refer to a connection or causal link between a discharge and damages:

(1) The cost of restoring, repairing, or replacing any real or personal property *damaged or destroyed by a discharge* ... and any reduction in value of such property *caused by such discharge* by comparison with its value prior thereto;

(2) The cost of restoration and replacement, where possible, of any natural resource *damaged or destroyed by a discharge;*

(3) Loss of income ... due to damage to real or personal property, including natural resources *destroyed or damaged by a discharge* ...;

(4) Loss of tax revenue ... due to damage to real or personal property *proximately resulting from a discharge.* ...

[ (Emphasis added).]

 Thus, through the requirement of a connection between the discharge, over which the party had some control or responsibility, and the Spill Act response to the damage, the focus in the Spill Act remains on proof of a connection between the discharge complained of and the resultant Spill Act response. The task remains to clarify the proof necessary to establish that connection.

## C.

 The DEP argues that we should be guided in our task by the federal standard for causation in CERCLA cases. However, there are important differences between CERCLA and the Spill Act that require some pause before assuming that an alignment in standards is appropriate.

 First, the Spill Act and CERCLA differ significantly with respect to liability. The Spill Act renders parties liable, jointly and severally, for damages, and CERCLA permits divisibility among responsible parties. *Compare N.J.S.A.* 58:10–23.11g(c)(1) (imposing joint and several liability on any person or entity in any way responsible for discharge of hazardous substance), *with Burlington N. & Santa Fe Ry. Co. v. United States,* 556 *U.S.* 599, 613–615, 129 *S.Ct.* 1870, 1880–81, 173 *L.Ed.*2d 812, 825 (2009) (interpreting CERCLA as providing for apportionment among responsible parties when reasonable basis exists for determining individual contributions). Thus, liability under the Spill Act car-

ries significantly different and potentially more severe consequences than CERCLA liability.[12]

Second, CERCLA has its own unique legislative history that has informed courts on the subject of causation. CERCLA's liability provision, 42 *U.S.C.A.* § 9607, is similar to the Spill Act insofar as it does not prescribe any particular causation standard. It states simply that any covered person under the act "shall be liable" for the release or threatened release of a hazardous substance from a facility into the environment "which causes the incurrence of response costs." 42 *U.S.C.A.* § 9607(a). When the bills that later became CERCLA were originally introduced, both the House and Senate versions contained additional language requiring that a defendant's release of hazardous substances be the proximate cause of the incurrence of response costs in order for liability to attach. H.R. 7020, 96th Cong. 2d. Sess., § 3071(a) (1980); S. 1480, 96th Cong. 1st Sess., § 4(a) (1979). Because that language was eliminated in the final compromise bill, courts have agreed that CERCLA imposes no proximate-cause requirement and that a plaintiff need only demonstrate "some connection" between a defendant's actions and the environmental contamination that causes the incurrence of response costs. *See N.J. Tpk. Auth.*, *supra*, 197 *F.*3d at 105; *United States v. Alcan Aluminum Corp.*, 964 *F.*2d 252, 264–65 (3d Cir.1992); *United States v. Monsanto*

---

[12] The Spill Act does provide some mechanism for divisibility, in that a party who "cleans up and removes a discharge of a hazardous substance" may bring an action for contribution "against all other dischargers and persons in any way responsible for a discharged hazardous substance...." *N.J.S.A.* 58:10–23.11f(a)(2)(a). When resolving such an action for contribution, "a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate," *ibid.*, and grant an award of treble damages to a prevailing contribution plaintiff, *N.J.S.A.* 58:10–23.11f(a)(3). The difference between the Spill Act's apportionment process and that provided for in CERCLA is that a CERCLA defendant who can prove "that a reasonable basis for apportionment exists" will only be liable in the first place for the damages attributable to that defendant, not for the entire cost of remediating the release. *See Burlington, supra*, 556 *U.S.* at 614, 129 *S.Ct.* at 1881, 173 *L.Ed.*2d at 825.

*Co.,* 858 *F.*2d 160, 170 (4th Cir.1988), *cert. denied,* 490 *U.S.* 1106, 109 *S.Ct.* 3156, 104 *L.Ed.*2d 1019 (1989).

The circumstances that led federal courts to conclude that CERCLA requires only "some connection" between a release and the incurrence of response costs are not replicated in the legislative history of the Spill Act, and thus it would not be appropriate for us to simply adopt the causation standard applied in CERCLA claims to those brought under our Spill Act without first undertaking a thorough review of the Act and its legislative history. It is to that endeavor that we now turn.

### D.

Neither the Spill Act nor its corresponding legislative history definitively address the level of causation needed to impose liability on a discharger. The statute itself merely provides that "the [DEP] need prove only that an unlawful discharge occurred which was the responsibility of the discharger or other responsible party. . . ." *N.J.S.A.* 58:10–23.11q. Legislative history of our Spill Act reveals that early drafts of the Act distinguished between liability for cleanup expenditures and liability for damages. For example, the proposed statute originally read that a discharger "shall be strictly liable, without regard to fault, for all direct and indirect damages no matter by whom sustained." Assemb. 1903 [Official Copy Reprint], 197th Leg. (N.J. 1976). However, that section was amended before passage to provide liability "for all *cleanup and removal costs and for all* direct and indirect damages." Assemb. 1903 [Official Copy Reprint], 197th Leg. (N.J. 1976) (alterations emphasized in original). The Sponsors' Statement for the bill echoed a similar sentiment. "The liability of a major facility or vessel for such damages is to be imposed . . . regardless of fault. In addition, any person who is responsible for a discharge is subject to liability without fault for the full extent of cleanup and removal costs." S. 1409 (*Sponsors' Statement* ), 197th Leg. (N.J. 1976); *see also S. Energy & Env't Comm. Statement to S., No. 1409,* 197th Leg. (1976) ("The discharger shall also be

strictly liable, without regard to fault, for all cleanup and removal costs, but liable only for damages which do not exceed $50,000,000.00 for each major facility. . . ."). Those provisions reflect intent to treat cleanup and removal expenditures as distinct from liability for damages.

Liability for post-discharge removal naturally exists independent of damages arising from a discharge itself. As a result, it appears that all liability under the Spill Act is not tied to a static causation nexus. On the other hand, some causal link is undoubtedly required to impose liability for damages resulting from a discharge. *See Assemb. Agric. & Env't Comm. Statement to Assemb., No.1903,* 197th Leg. (N.J. 1976) (stating that fund would be liable for "cleanup and removal costs and . . . compensation for direct and indirect damages *resulting from* spills of oil or other hazardous substances") (emphasis added); *S. Energy & Env't Comm. Statement to S., No. 1409,* 197th Leg. (N.J. 1976) (noting that "[t]his bill . . . establishes a spill compensation fund to finance such cleanup and removal and to pay for *damages caused by* such discharge. . . ." (emphasis added)). Those provisions, however, do not specify how stringent such a causation standard must be. Instead, those provisions simply clarify that the Fund created by the Spill Act may be used to pay for damages caused only by hazardous spills. They provide no guidance as to whether a stricter notion of causation is required, or if a more lenient causation connection, such as is applied under CERCLA, is more appropriate to guide liability under the Spill Act.

Although the legislative history fails to provide a conclusive answer on the requisite connection between liability and all forms of relief under the Act, our review of the Act's language and legislative history leads us to conclude that there is no basis for importing a proximate-cause analysis into the calculus when assessing the bases for relief. Imposing that proof requirement for damages as a precondition to the various forms of relief meant to be available under the Act would thwart the salutary public purpose underlying this comprehensive and groundbreaking statu-

tory program. Importantly, we fail to see that either the trial court or the Appellate Division imposed that standard in this matter.

 In implementing the Act in accordance with the spirit animating its adoption and refinement over the years, the causation standard to be applied to Spill Act claims must accommodate the Act's multiple forms of relief and must support and justify a range of relief available under the Act, which includes injunctive relief, and/or the recovery of damages and those costs available under the Act, *as the request for relief is framed.* In this matter, a party in Sue's circumstances must be shown to have committed a discharge that was connected to the specifically charged environmental damage of natural resources—the groundwater damage—in some real, not hypothetical, way. A reasonable nexus or connection must be demonstrated by a preponderance of the evidence. As the Third Circuit noted, in a case that the Appellate Division cited favorably, *see Dimant, supra,* 418 *N.J.Super.* at 543, 14 *A.*3d 780, while a plaintiff need not "trace the cause of the response costs" to each defendant in a multi-defendant case involving a contaminated site, it is not enough for a plaintiff to simply prove that a defendant produced a hazardous substance and that the substance was found at the contaminated site and "ask the trier of fact to supply the link." *N.J. Tpk. Auth., supra,* 197 *F.*3d at 105 n. 9 (quoting *N.J. Tpk. Auth. v. PPG Indus.,* 16 *F.Supp.*2d 460, 469 (D.N.J.1998)). In sum, we hold that on proof of the existence of a discharge, one can obtain prompt injunctive relief under the Spill Act. However, in an action to obtain damages, authorized costs and other similar relief under the Act there must be shown a reasonable link between the discharge, the putative discharger, and the contamination at the specifically damaged site.

 We now apply that standard in this matter. Here the trial court found that the DEP's proofs failed to connect the discharge from the pipe, *during Sue's operation,* to the soil or groundwater damage at the heart of this contamination case. The

case was not about contamination of the asphalt onto which the PCE was found leaking. It was about PCE contamination of groundwater in the vicinity of Sue's and other potential responsible parties. There was no basis—on the state of these proofs as found by the trial court—to shift to Sue's liability for compensatory damages for cleanup of the wells that were tainted, or even for the investigatory expenses associated with remediation of the natural-resource damage, because the DEP never made the requisite connection showing how the dripping PCE at Sue's reasonably could have made its way into the groundwater. Nor can the DEP credibly claim, more than a decade after first observing the dripping pipe on Sue's premises, that Sue's must bear the expense of studying the various ways in which that drip might have contributed to the groundwater pollution and what must now be done to remediate the groundwater pollution. The belated posture of this proceeding renders saddling Sue's with such a claim, on this record, unfair, although there are compelling reasons for considering the federal approach taken in CERCLA cases that have addressed causation proof difficulties in similar circumstances.

Amici cite other federal cases, in addition to the Third Circuit's *New Jersey Turnpike* case which involved CERCLA and Spill Act claims, that discuss "two-site" contamination scenarios similar to the case at bar. In "two-site" cases, "hazardous substances are released at one site and allegedly travel to a second site...." *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 171 *F*.3d 1065, 1068 (6th Cir.1999); *see also Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 *F.Supp.*2d 175, 185 (D.Conn.2009). In such circumstances, "in order to make out a prima facie case, the plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up." *Kalamazoo, supra,* 171 *F*.3d at 1068. Thus, "a plaintiff must provide some evidence linking its response costs to the targeted off-site release of contaminants." *Innis Arden, supra,* 629 *F.Supp.*2d at 186 (citing cases). In the *Innis Arden* decision, the United States District Court for the

District of Connecticut described the "absurd" consequences that might result if a plaintiff were not required to show some connection between a release and damages where a plaintiff alleges that her property has been contaminated by a hazardous substance released at a nearby property:

Under Plaintiffs' legal theory, as long as any response costs are being incurred by a plaintiff, any party that disposed of any hazardous substance is liable to compensate that plaintiff. It does not matter what type or amount of hazardous substance was disposed of by the party. Any hazardous substance in any quantity will open the floodgates of liability, and will do so even if the hazardous substance disposed of by the party is not causing any harm, is not threatening to cause any harm, and is not any part of the reason a response is needed and costs of that response are incurred.... Plaintiffs' theory is not supported by statute, by precedent, or on policy grounds consistent with statutes and precedents.

[629 *F.Supp.*2d at 186 (quoting *Acushnet Co. v. Coaters Inc.*, 937 *F.Supp.* 988, 993 (D.Mass.1996)).]

Similarly, in *Castaic Lake Water Agency v. Whittaker Corp.*, 272 *F.Supp.*2d 1053 (C.D.Cal.2003), a case with facts similar to those present here, the court articulated a test for establishing such a connection. In *Castaic*, hazardous substances originated at one site and allegedly migrated to wells owned by plaintiff water providers at a different site. *Id.* at 1064–65. The court noted that plaintiffs could satisfy their burden of production with respect to causation under CERCLA by: (1) identifying the hazardous substance at their site; (2) identifying the same hazardous substance at defendant's site; and (3) providing "evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site." *Id.* at 1066 (footnote omitted). The "plausible migration pathway" could be in the form of an "undisputed release of thousands of gallons of water from the contaminated site into the [river]," or "underground migration," or the transportation of waste from one site to another. *Ibid.* n. 14 (citing various examples from case law). We include discussion of these because they provide concrete examples of the type of proofs that might have made for a different result in this matter, but which were not mustered here.

In the end, the trial court here did what courts must do. It found the facts and, having found them, determined them lacking.

The DEP's proofs were inadequate to obtain the relief it sought from Sue's. It never presented sufficient proof of a reasonable, tenable basis for how the drip of fluid containing PCE observed at Sue's one day in 1988 resulted in the contamination of the groundwater in Bound Brook. Thus the DEP's claims for relief—for loss of natural resources and to have Sue's reimburse the State for the cost of remedying the harm to individual citizens that resulted from the contamination of groundwater—were rejected by the trial court, affirmed by the Appellate Division, and we see no basis for disturbing those sound findings. To the extent that the DEP claims that there was enough of a connection to support having Sue's study the contamination and determine a remedy for *its* discharge, we conclude that it would be fundamentally unfair to saddle Sue's with such an investigatory obligation, on a joint and several liability basis, at this time, considerably more than a decade after the DEP discovered the dripping pipe during Sue's operation. Thus, we affirm also the dismissal of the claim seeking to have Sue's, in 2004, begin to study the contamination and determine a remedy for the pollution of this site. Our holding should not be viewed as expressing any view on the claims that other past operators at Sue's had involvement in the PCE contamination as that is not before us, because the DEP omitted those defendants from their case in chief when it was filed.

## VI.

The judgment of the Appellate Division is affirmed as modified.

*For affirmance and modification*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON and WEFING (temporarily assigned)—7.