152 N.J. 137 (1997)
703 A.2d 927
MARIE MARSH, PETITIONER-RESPONDENT AND CROSS-APPELLANT,
v.
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, ENVIRONMENTAL CLAIMS ADMINISTRATION, SPILL COMPENSATION FUND, RESPONDENT-APPELLANTS AND CROSS-RESPONDENTS.
The Supreme Court of New Jersey.
Argued September 8, 1997.
Decided December 18, 1997.
*139 Richard F. Engel, Deputy Attorney General, argued the cause for appellants and cross-respondents (Peter Verniero, Attorney General of New Jersey, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Mark D. Oshinskie, Deputy Attorney General, on the briefs).
Craig J. Huber, argued the cause for respondent and cross-appellant (Archer & Greiner, attorneys).
The opinion of the Court was delivered by O'HERN, J.
This appeal concerns the right of one who has acquired property, without knowledge of the presence on the property of hazardous substances, to seek reimbursement of the costs of remediation under the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24. The Act created the New Jersey Spill Compensation Fund (Spill Fund or Fund), which provides for qualified claimants reimbursement of the cleanup costs for environmental contamination. We affirm the judgment of the Appellate Division that this claimant is ineligible to recover under the Spill Fund. We do so because the property was discharging pollutants during the period of her ownership. We disapprove, on this record, the invalidation of N.J.A.C. 7:1J-2.7(b)(1), a 1993 regulation that makes ineligible for Spill Fund recovery a property owner who had not exercised, before acquisition of property, due diligence in ascertaining the presence of environmental contamination. We also find no legislative authority for the Appellate *140 Division's recognition of a minimal discharge exception from the provisions of the Spill Act that impose liability on the owner of a property discharging hazardous substances.

I
The parties have stipulated to the pertinent facts. In 1991, Marie Marsh's mother conveyed to her property at 772 Black Horse Pike, Turnersville, Washington Township, New Jersey. From 1930 through 1974, three prior owners of the property, including Marsh's parents, leased the property to operators of gas stations. After receiving title to the property, Marsh attempted to obtain subdivision approval. During that process, Township representatives informed her that there might be underground petroleum storage tanks located on the property and that the tanks would have to be registered and then either removed or properly closed.
Upon receipt of this information, Marsh retained an engineering consultant firm (Krydon) to conduct an examination of the property. Krydon advised her that it believed that there were two underground storage tanks existing on the property. In March 1991, Marsh authorized Krydon to excavate the tanks.
During the course of the excavation, Krydon discovered that the tanks had not been properly sealed or filled with an inert material. In addition, during the excavation, Krydon discovered three other tanks that it had not suspected to be beneath the property. Krydon found that the three additional tanks were perforated and had discharged petroleum products into the soil in the past and that at least one of the tanks was still leaking petroleum. Marsh spent more than $41,000 to have the tanks and contaminated soil removed. The New Jersey Department of Environmental Protection and Energy (DEP) advised her that, in addition, she would have to install monitoring wells and sample ground water, at a cost in excess of $10,000. DEP also told Marsh that if contaminated ground water were found, her costs of cure would greatly exceed $10,000.
*141 Marsh was unaware of the presence of the underground tanks until Krydon informed her of its discovery of the tanks. The property was never used as a gas station during Marsh's ownership. Neither she nor her tenants used the underground tanks.
On April 23, 1992, Marsh filed a claim with the Spill Fund seeking compensation for cleanup costs incurred as a result of the presence of the hazardous substances on her property. The Administrator of the Spill Fund denied Marsh's claim and referred the matter as a contested case for a hearing before an Administrative Law Judge (ALJ). The Fund argued that, pursuant to N.J.S.A. 58:10-23.11g(c)(1) (hereafter referred to as 11g(c)), Marsh was in the disqualified category of a person "in any way responsible for the discharge," either because she owned the property while a discharge of gasoline occurred or because she had not exercised due diligence before acquiring the property.
Marsh contended that at the time of her acquisition there was no responsibility on the part of a person taking title to property to conduct an inquiry into the presence of hazardous substances and that such a requirement had only recently been inserted into the Spill Act by Section 44 of the Industrial Site Recovery Act (ISRA), L. 1993, c. 139, amending section 11g of the Spill Act. This 1993 provision imposed specific responsibility to investigate for hazardous substances on a person who plans to acquire property as a condition of being absolved from responsibility under the Spill Act.[1] Marsh argued that there was no law creating such a duty *142 prior to the effective date of this amendment, when Marsh received her property, and that the Legislature had specifically provided (in the last paragraph of N.J.S.A. 58:10-23.11g(d)(2)) that there should be no retroactive application of ISRA. She also argued that a similar due diligence requirement set forth in N.J.A.C. 7:1J-2.7(b)(1) went into effect after the disapproval of her claim and could not be given retroactive effect.
Administrative Law Judge Tylutki denied Marsh's Spill Fund claim. She held that, as an owner of the premises, Marsh was responsible for that portion of the discharge that took place during the time she held title to the property. The ALJ read the case law to provide a narrow defense to Spill Act liability for innocent landowners, but she concluded that the innocent landowner defense was unavailable to Marsh. According to the ALJ, even though Marsh may not have known about the underground tanks on the site, by accepting the property with knowledge that her *143 parents had leased it for use as a gasoline service station, Marsh assumed the risk that the property had been contaminated. The ALJ therefore concluded that Marsh would be strictly liable for the discharge that took place while she owned the property. Apparently operating under the belief that Marsh could collect from the Spill Fund the cost of cleaning whatever portion of the pollution existed before she took title, the ALJ noted the absence of proof that any discharge had taken place before Marsh owned the lot. Because N.J.A.C. 7:1J-2.3 places the burden on the claimant to prove satisfaction of all requirements for Spill Fund recovery, the ALJ denied Marsh's claim in total.
On appeal, the Appellate Division affirmed the denial of the claim but disagreed with the reasoning of the ALJ. Relying on our decision in Department of Environmental Protection v. Ventron Corp., 94 N.J. 473, 468 A.2d 150 (1983), it concluded that the fact that "de minimis" quantities of hazardous substances continued to make their way off polluted property during a period of ownership did not make an owner of property "responsible for a hazardous substance" within the meaning of 11g(c). In addition, it concluded that the DEP could not rely on the requirement of due diligence created by the 1993 amendment to N.J.S.A. 58:10-23.11g because the amendment applied only to those transfers made on or after its effective date. (The amendment took effect on September 14, 1993. Marsh received the property in February 1991.) The panel further concluded that N.J.A.C. 7:1J-2.7(b)(1), which required a transferee to make a diligent inquiry before obtaining title in order to be eligible to recover from the Fund, was not authorized by law until ISRA later amended N.J.S.A. 58:10-23.11g.
However, the Appellate Division found that Marsh's mother was clearly a party "responsible for a hazardous substance" within the meaning of 11g(c) because she should have known of the existence of the leaking tanks on her property long before she gave the land to her daughter and she failed to stop the leaks or remove the contamination. The panel would not interpret the Spill Act to *144 permit a property owner who has profited by contamination or permitted the contamination of property to obtain public financing for the cleanup of pollution by the expedient of making a gift of the property to a family member. Consequently, it held that a donee's right to recover reimbursement from the Spill Fund is no greater than the entitlement of a donor. The court declined to decide whether the donee of a property might be liable for cleanup costs in an amount greater than the value of the property.
We granted Marsh's petition for certification and DEP's cross-petition concerning the validity of its regulation and the exception from responsibility for de minimis discharges. 147 N.J. 576, 688 A.2d 1052 (1997).

II
In order to put the issues in perspective, it is necessary to review again the history of the Spill Act. See Buonviaggio v. Hillsborough Township Comm., 122 N.J. 5, 7-10, 583 A.2d 739 (1991).
New Jersey's Spill Act was a pioneering effort by government to provide monies for a swift and sure response to environmental contamination. Since the enactment of New Jersey's Spill Act, many states and the federal government have followed suit. E.g., N.Y. Navigation Law §§ 171-97 (McKinney 1989 & Supp. 1996); Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C.A. §§ 9601-9675 (West 1997).
The Spill Act was adopted in 1976 to deal with potential contamination from off-shore oil spills and to stem the "threat to the economy and environment of this State" posed by the "discharge of petroleum products and other hazardous substances." N.J.S.A. 58:10-23.11a. When incidents such as the Love Canal disaster heightened concerns about toxic pollution, the Legislature responded by broadening the scope of the Spill Act and streamlining its administration. It widened the Spill Fund's tax base, N.J.S.A. 58:10-23.11h (as amended by L. 1979, c. 346, § 9), and it shifted control of the Fund from the Department of the Treasury *145 to the DEP. N.J.S.A. 58:10-23.11i (as amended by L. 1985, c. 115, § 3). Although DEP has continued its managerial role (under which it must quickly deploy entrusted public funds to restore the environment and abate damages from the discharge of hazardous substances), it has assumed a second role, a defensive role, as keeper of the public purse. DEP must attempt to fulfill both of those roles in the context of complex environmental cleanups and a finite source of cleanup funds.

III
We turn to the substance of this appeal bearing in mind the legislative purpose of the Spill Act and the DEP's role in administering it. We begin with the premise that Marsh may not collect cleanup costs from the Spill Fund if she would be liable for those costs under the Spill Act. In Tree Realty, Inc. v. Dep't of Treasury, 205 N.J. Super. 346, 500 A.2d 1075 (1985), the Appellate Division recognized the futility of allowing persons responsible for cleanup costs to recover from the Fund, given that N.J.S.A. 58:10-23.11q conditions recovery from the Fund on the Fund's obtaining by subrogation all rights the claimant has against the discharger or other responsible parties. Id. at 348-49, 500 A.2d 1075; see also N.J.A.C. 7:1J-2.7(a) (declaring ineligible for compensation from Fund all claims of persons in any way responsible for relevant discharge, subject to certain exceptions).
To determine whether Marsh may have been liable under the Spill Act when she filed her claim in 1992, we turn to the text of 11g(c) as it read at that time. Effective March 13, 1991, 11g(c) read (and still reads) as follows:
Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department or a local unit pursuant to [N.J.S.A. 58:10-23.11f].
Whether Marsh is liable for cleanup costs thus hinges on whether she is "in any way responsible" for the pollution that occurred on *146 her property. We are convinced that Marsh is a responsible person within the meaning of 11g(c). We reach this conclusion not because of any lack of due diligence on Marsh's part, and not because Marsh actively discharged any pollutants, but because the underground gasoline tanks leaked during Marsh's ownership of the property.
When the Spill Act was first enacted, liability under 11g(c) depended on one's having "discharged" a hazardous substance. L. 1976, c. 141, § 8c ("Any person who has discharged a hazardous substance shall be strictly liable, without regard to fault, for all cleanup and removal costs."). Under that language, there was a strong argument that a landowner, such as Marsh, who did not actively participate in a discharge upon her property was not liable for cleanup costs. See Department of Envtl. Protection v. Exxon Corp., 151 N.J. Super. 464, 474, 376 A.2d 1339 (Ch.Div. 1977) (holding that "strict liability is clearly inapplicable" where defendant "did not knowingly permit the oil to accumulate and did nothing to encourage or contribute to oil being stored up there"); Daniel J. Sheridan, What Exactly Is an Innocent Landowner? Recent Developments in Envtl. Due Diligence, N.J. Lawyer, Apr. 1994, at 32, 36.
With its 1979 amendment, the Legislature expanded the scope of Spill Act liability. No longer was liability limited to those who had actively discharged hazardous substances. Rather, one was strictly liable if one was "in any way responsible for any hazardous substance which the [DEP] has removed or is removing pursuant to ... this act." L. 1979, c. 346, § 8c.
This Court interpreted the phrase "in any way responsible" in Ventron, supra, 94 N.J. 473, 468 A.2d 150. We noted that while the Legislature never defined the phrase, it "intended the Spill Act to be `liberally construed to effect its purposes.'" Id. at 502, 468 A.2d 150 (citing N.J.S.A. 58:10-23.11x). We therefore concluded that although "[t]he subsequent acquisition of land on which hazardous substances have been dumped may be insufficient to hold the owner responsible," one who owned or controlled *147 the property at the time of the pollution was a responsible party. Ibid. (citing DEP v. Exxon, supra, 151 N.J. Super. at 470-74, 376 A.2d 1339); see also In re Kimber Petroleum Corp., 110 N.J. 69, 85, 539 A.2d 1181 (stating that "[a] party even remotely responsible for causing contamination will be deemed a responsible party under the Act"), appeal dismissed sub nom. Kimber Petroleum Corp. v. Daggett, 488 U.S. 935, 109 S.Ct. 358, 102 L.Ed.2d 349 (1988).
Following a further Spill Act amendment in 1991, the DEP adopted a regulation, N.J.A.C. 7:1E-1.6, that incorporated a similar interpretation of responsibility. Sheridan, supra, N.J. Lawyer, Apr. 1994, at 36. In a chapter of the New Jersey Administrative Code that explains the procedures one should follow when hazardous substances are discharged, the DEP defined "person responsible for a discharge" to include, among others, "[e]ach owner or operator of any facility, vehicle or vessel from which a discharge has occurred." N.J.A.C. 7:1E-1.6.

IV
Marsh contends that because ISRA has imposed upon persons who acquire ownership of property an affirmative duty to investigate the property prior to taking ownership, it follows that prior to the passage of this law no similar duty existed. She insists that a party who acquired property before ISRA's enactment and who failed to conduct such an investigation before acquisition could not be liable under the Spill Act for contamination caused by prior property owners. According to Marsh, such a party would therefore be eligible to recover from the Spill Fund the cost of removing the contamination.
That interpretation would turn the law on its head. Marsh's contention that ISRA created a "prospective duty" on landowners, and that prior to its enactment no such duty existed, is flawed. ISRA did not impose a duty on landowners to inquire diligently into the condition of their property. Rather, it established a "new *148 defense"[2] to Spill Act liability for landowners who acquired their property after it had been contaminated and who could prove that they conducted such an investigation. Edward F. McTiernan & Irwin M. Freilich, Joint and Several Liability in New Jersey: What are the Limits?, N.J. Lawyer, Apr. 1994, at 45, 56. ISRA brought the Spill Act into line with CERCLA, which was amended in 1986 to incorporate an innocent landowner defense. Sheridan, supra, N.J. Lawyer, Apr. 1994, at 36 (discussing 42 U.S.C.A. §§ 9607(c) and 9601(35)).
In effect, Marsh asks us to hold that because the innocent landowner defense did not exist when she received her property, she cannot be held liable, and therefore ineligible for Spill Fund reimbursement, under liability provisions that have been at the core of the Spill Act since 1979. Even if we accept Marsh's contention that ISRA's innocent landowner defense had prospective effect only, we would still be forced to deny Marsh's claim. The addition of a prospective defense (that the claimant cannot satisfy) does not nullify the pre-existing operative provisions of a statute.
We should state in addition that we reject the premise of Marsh's ISRA-based argument. We do not agree that the passage of ISRA eviscerated any pre-existing requirement that would-be claimants exercise diligence before acquiring polluted property in order to preserve their rights to recover from the Spill Fund. In particular, N.J.A.C. 7:1J-2.7(b), which became effective January 4, 1993 (roughly nine months before ISRA), specifically established that owners of contaminated property could not recover *149 from the Spill Fund if they did not exercise reasonable diligence before acquiring their property.[3] We would not invalidate that regulation on the ground that it preceded the enactment of the ISRA amendments. The Legislature has long reposed a broad measure of discretion in the DEP to administer the Spill Act. See GATX Terminals Corp. v. Dep't of Envtl. Protection, 86 N.J. 46, 52-53, 429 A.2d 355 (1981). The judicial role in reviewing administrative regulations is limited. A court may not invalidate a regulation as long as it is "within the fair contemplation of the enabling statute" and is neither arbitrary nor unreasonable. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561-63, 384 A.2d 795 (1978) (citing Southern Jersey Airways, Inc. v. National Bank of Secaucus, 108 N.J. Super. 369, 383, 261 A.2d 399 (App.Div. 1970)). The DEP's determination before 1993 to limit Spill Fund payments to those who exercised due diligence was neither arbitrary, unreasonable, nor inconsistent with the DEP's statutory mandate; and the DEP's application of that policy to pending claims, in accord with N.J.A.C. 7:1J-1.2, was a valid exercise of its jurisdiction. The drafters of the pre-ISRA Spill Act clearly could not have intended that purchasers of property indifferent to the presence of contamination should be able to clean up their land with public funds.

*150 V
Finally, we are unable to agree that our decision in Ventron created a de minimis exception to the provisions of the Spill Act. In that case, the Appellate Division had held that the Wolfs, as subsequent purchasers of land that had been the site of a mercury processing plant and from which mercury had seeped into a tidal estuary, would not be liable under the Spill Act for the cost of cleaning the estuary. The DEP did not petition for certification on the issue of the Wolfs' liability, and we expressly stated that we were not considering that issue on appeal. Ventron, supra, 94 N.J. at 493, 468 A.2d 150. Our statement that the Wolfs were "responsible for only a minimal aggravation of the underlying hazardous condition," ibid., was merely an expression of the reasoning that, we presumed, led the DEP not to pursue the Wolfs for Spill Act damages. We never stated that the DEP could not recover such damages from the Wolfs had it pursued the appeal. We expect, however, that DEP would not arbitrarily exercise its power to assert Spill Act claims against persons responsible for minimal discharges.

VI
To sum up, as the owner of property from which hazardous substances were being discharged during a period of her ownership, Marsh is a person "responsible for a hazardous substance." She therefore would be subject to liability under the Spill Act for cleanup costs, and she may not recover her own cleanup costs from the Spill Fund. The passage of ISRA, which created a defense to Spill Act liability that is unavailable to Marsh, has no bearing on her Spill Fund claim. We acknowledge Marsh's good faith and her attempts to remedy this environmental condition. Whether DEP would exercise its discretion to impose personal responsibility on such a party to clean up past pollution is a different question from whether such a party may recover the costs of remediation from the Fund.
*151 We affirm the judgment of the Appellate Division denying Marsh's claim under the Spill Fund. We disapprove the invalidation of N.J.A.C. 7:1J-2.7(b) with respect to property transferred before ISRA's enactment and the recognition of a de minimis defense to Spill Act responsibility.
For affirmance and modification  Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, STEIN and COLEMAN  6.
Opposed  None.
NOTES
[1] With the passage of ISRA in 1993, N.J.S.A. 58:10-23.11g(d)(2) now reads,

A person, including an owner or operator of a major facility, who owns real property acquired after the effective date of P.L. 1993, c. 139 (C. 13:1K-9.6 et al.), on which there has been a discharge, shall be considered a person in any way responsible for the discharged hazardous substance pursuant to subsection c. of this section, unless that person can establish by a preponderance of the evidence that all of the following apply:
(a) the person acquired the real property after the discharge of that hazardous substance at the real property;
(b)(i) at the time the person acquired the real property, the person did not know and had no reason to know that any hazardous substance had been discharged at the real property, or (ii) the person acquired the real property by devise or succession, except that any other funds or property received by that person from the deceased real property owner who discharged a hazardous substance or was in any way responsible for a hazardous substance, shall be made available to satisfy the requirements of P.L. 1976, c. 141;
(c) the person did not discharge the hazardous substance and is not in any way responsible for the hazardous substance; and
(d) the person gave notice of the discharge to the department upon actual discovery of that discharge.
To establish that a person had no reason to know that any hazardous substance had been discharged for the purposes of this paragraph (2), the person must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property. For the purposes of this paragraph (2), all appropriate inquiry shall mean the performance of a preliminary assessment, and site investigation (if the preliminary assessment indicates that a site investigation is necessary), as defined in section 23 of P.L. 1993, c. 139 (C. 58:10B-1), and performed in accordance with rules and regulations promulgated by the department defining these terms.
Nothing in this paragraph (2) shall be construed to alter liability of any person who acquired real property prior to the effective date of P.L. 1993, c. 139 (C. 13:1K-9.6 et al.).
[2] The defense ISRA created for innocent landowners was only "new" in terms of explicit statutory expression. We leave for another day the issue of whether a landowner who took title to her property before ISRA's enactment and who at that time had neither actual nor constructive knowledge of pre-existing contamination may be liable under the Spill Act for the cost of cleaning up that pre-existing pollution.
[3] N.J.A.C. 7:1J-2.7(b), as far as it is relevant here, provides,

If, after a discharge occurs, a person purchases or otherwise voluntarily acquires or obtains title to the land from which the discharge emanated, claims by such purchaser in connection with the discharge are ineligible for compensation from the Fund, unless such purchaser can establish to the satisfaction of the Department that the claim satisfies ... the following requirement[]:
1. Despite exercising reasonable diligence and intelligence before purchasing or otherwise acquiring or obtaining title to the land, the claimant did not discover until after purchasing or otherwise acquiring or obtaining title to the land that any hazardous substance has been discharged or was discharging from the property in question; and, before purchasing or otherwise acquiring or obtaining title to the land, the claimant conducted a diligent and thorough inquiry into previous ownership and uses of the property.