124 A.3d 257

NL INDUSTRIES, INC., PLAINTIFF, v. STATE
OF NEW JERSEY, DEFENDANT.

Superior Court of New Jersey
Law Division Middlesex County

Decided August 27, 2014—Approved for Publication September 23, 2015.

431

*Christopher R. Gibson,* for plaintiff (*Archer & Greiner, P.C.,* attorneys).

*David Frankel,* Deputy Attorney General, for defendant (*John J. Hoffman,* Acting Attorney General, attorney).

WOLFSON, J.S.C.

This action was brought by plaintiff, NL Industries, Inc. ("NL" or "plaintiff") to recover cleanup costs associated with contamination resulting from the construction of a seawall and jetty in the Laurence Harbor area of Old Bridge Township, New Jersey ("the Township"), known as the Raritan Bay Slag Site ("RBS site"). Specifically, the complaint in this matter [1] alleged that the State, in accordance with its regulatory jurisdiction, approved the construction of a seawall that incorporated the use of certain heavy metal laden slag material, which ultimately caused (or contributed to) lead contamination, for which the estimated cost of remediation will likely exceed $75 million.

The State filed the instant motion to dismiss, arguing that (1) the Spill Compensation and Control Act ("Spill Act" or the "Act"), *N.J.S.A.* 58:10–23.11, did not retroactively abrogate the State's sovereign immunity from suit for acts or omissions occurring prior to its April 1, 1977, effective date; (2) NL must comply with the procedural and substantive requirements of the Tort Claims Act ("TCA"), *N.J.S.A.* 59:1–1, before any liability may be imposed against the State; and (3) the complaint fails to plead facts sufficient to find that the State was "in any way responsible" for the alleged discharge. In order to resolve this motion, the court must address two distinct issues of first impression: (1) whether the New Jersey Legislature intended that the Spill Act abrogate the State's sovereign immunity retroactively; and (2) whether the procedural and substantive requirements of the TCA should be deemed applicable to Spill Act claims. After carefully reviewing

---

[1] An action involving similar allegations was filed by NL in federal court, naming as defendants multiple municipalities, as well as a number of private defendants. The State was voluntarily dismissed from that case and was sued in this action.

the parties' submissions and hearing oral argument, the State's motion is denied.

### I. Factual Background and Procedural History [2]

The factual allegations giving rise to this complaint occurred over the course of several decades and concern activities that occurred as early as the 1950s. During the 1950s, as a result of severe storm erosion, the shoreline of the Laurence Harbor section of the Township was damaged. The State, through its Department of Environmental Protection ("NJDEP"), solicited the United States Army Corps of Engineers ("USACE") to study the shoreline. The USACE recommended several shoreline and hurricane protection measures, including a beachfill protective structure and a levee. After protection measures were authorized, the State, USACE, and the Township entered into an agreement relating to the construction and maintenance of the Shore Protection Project ("project"). By 1966, the project was completed, and as part of the agreement, the State and the Township assumed responsibility for the maintenance, operation, and inspection of the beachfill and levee structures that had been constructed.

By 1968, Sea–Land Development Corporation ("Sea–Land"), a private developer, acquired a portion of what is now the RBS site for the purpose of developing the Laurence Harbor area. As part of that development, Sea–Land proposed to construct a seawall as a substitute for the beachfill protective feature that had been constructed earlier. On or about September 6, 1968, this proposal was addressed in depth at a joint meeting, in which the State, Township officials, and Sea–Land participated. During that meeting, Sea–Land advised that it intended to: (1) use slag materials [3]

---

[2] Since this matter is a motion to dismiss under *Rule* 4:6–2(e), the court must accept all statements contained in the complaint to be true, and must afford plaintiff the benefit of all favorable factual inferences. *Printing Mart–Morristown v. Sharp Elec. Corp.*, 116 *N.J.* 739, 746, 563 A.2d 31 (1989).

[3] NL operated a lead smelting facility in New Jersey, which produced a by-product known as furnace slag ("slag"), a material that contains lead and other

to construct the seawall; (2) construct the seawall fifteen feet above sea level; and (3) fill the area behind the seawall to the same elevation.[4] Despite having actual knowledge that the seawall would be constructed with this slag material and would necessarily come into contact with the Raritan Bay, the State approved the construction.

During this same time period, Sea–Land sought to obtain a riparian grant from the State, and it also submitted plans for the proposed project to the USACE, the State, and the Township. In December of 1969, the Natural Resources Council of the NJDEP provisionally approved the riparian grant to Sea–Land, which approval was contingent upon four specific conditions:

(1) Sea–Land was to deed back to the State its title to that portion of the grant dated December 18, 1922, covered by its deeds;

(2) Sea–Land was to convey to the State a perpetual easement for a beach area of 2.808 acres of grant to be conveyed;

(3) Sea–Land was to create a beachfront area acceptable to the USACE to replace the one constructed under the USACE's original coast protection project; and

(4) Sea–Land was to provide public access over its property to the newly proposed beach area.

Notably, the NJDEP did *not* prohibit Sea–Land's use of the lead-bearing slag material. To the contrary, in December 1969, the State granted Sea–Land a permit to construct the proposed seawall and to fill the adjoining land. Some five months later, in May, 1970, State officials participated in another meeting with the

---

heavy metals. Allegedly, NL produced at least some of the slag that was acquired by Sea–Land, to build the seawall and fortify the western jetty.

[4] The meeting was memorialized in an October 23, 1968, memorandum prepared by James Rankin of the NJDEP. The memorandum recites that "Sea Land proposed to build a seawall of slag and clay core with stone revetment on outshore (sic) side and berm."

USACE to discuss the specifics of the proposed project. Based upon Sea–Land's subsequent acceptance of the State's conditions, the State, the Township, and the USACE authorized Sea–Land to construct the seawall, which, along with the fill of the adjoining areas was completed by the early 1970s.

The complaint also alleges that even as the seawall was being constructed, certain Township and State officials expressed "concerns" about using lead-bearing slag. For instance, in one letter, the Chairman of the Township Conservation Commission, George Koehler, contacted the Chief of the NJDEP to stress his uneasiness about using "heavy metals and metal sulphates" in an area that "passed the high tide mark" and "dumping" it "into the Raritan Bay" thereby "pos[ing] an additional threat to increasing the pollution in the bay."

Prompted by those expressed concerns, on October 4, 1972, the NJDEP inspected the seawall, resulting in its preparation of a memorandum which acknowledged that Koehler, "*has brought to our attention* the use of slag containing lead and other heavy metals in the construction of a sea wall. . . ." (emphasis added). A few months later, on February 21, 1973, the Township engineer, Harvey P. Goldie, sent letters to a number of NJDEP, USACE, and the Township officials, inviting them to discuss "issues involving Laurence Harbor beachfront filling activities and beach erosion, in response to citizen inquiries." In response, Mr. Gingrich, of the NJDEP—Bureau of Solid Waste Management, stated, "To be brief, we do not feel that the New Jersey Bureau of Solid Waste Management is involved in the construction of the sea wall along Cliffwood Beach front, as this construction is being made of inert inorganic material." The meeting was held; however, no State officials attended.

On March 27, 1973, yet another meeting was held, this time at the NJDEP offices in Trenton. Officials from the State, the USACE, and the Township all attended. At that meeting, it is alleged that the State specifically acknowledged its ownership of the beach where the seawall was constructed, promising to supply

a report from its Bureau of Water Pollution Control "re: lead slag dumped by Sea Land." However, no actions were ever taken to remove any of the slag material, and the record is devoid of whether such report was ever written or delivered.

On November 4, 2009, the United States Environmental Protection Agency ("EPA") added the RBS property, a Superfund Site (which included the seawall and the western jetty), to the National Priorities List, because the EPA had detected elevated levels of lead and other heavy metals in the soil, beach sand, and sediment. On May 23, 2013, the EPA released a "record of decision" for the RBS Site, and imposed a remedial clean-up plan, estimated to cost approximately $79,000,000. Ultimately, on January 30, 2014, the EPA issued a unilateral administrative order, demanding that NL perform the remedial actions required by the record of decision.

In this action, NL seeks contribution from the State not only because it "caused and contributed to the majority of the problems at the RBS site by allowing the use of lead-bearing slag in the seawall and western jetty in the first place," but also because "their subsequent inaction allowed the initial problem to become much larger and more expensive to address." In contrast, NL contends that it "never owned or leased any property at the RBS Site, never operated there, never dumped any material there, nor played any role in the decision of the developers and the Public Polluters to place lead-bearing material in the water."

## II. Discussion.

### a. The Spill Act and State's Retroactive Liability.

When called upon to interpret the meaning of the statutory language, the guiding principle is to ascertain the legislative intent. Indeed, "[t]he Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." *DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). To that end, courts "ascribe to the statutory words their ordinary meaning and significance . . . and read them in context with related provisions so as to give

sense to the legislation as a whole." *Id.* at 492, 874 *A.*2d 1039. A court should not " 'rewrite a plainly-written enactment of the Legislature [ ]or presume that the Legislature intended something other than that expressed by way of the plain language.' " *Id.* at 492, 874 *A.*2d 1039 (quoting *O'Connell v. State*, 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002)). "We cannot 'write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment.' " *Id.* at 492, 874 *A.*2d 1039 (quoting *Craster v. Bd. of Comm'rs of Newark*, 9 *N.J.* 225, 230, 87 *A.*2d 721 (1952)). And, of course, we cannot " 'engage in conjecture or surmise which will circumvent the plain meaning of the act.' " *Id.* at 492, 874 *A.*2d 1039 (quoting *In re Closing of Jamesburg High School*, 83 *N.J.* 540, 548, 416 *A.*2d 896 (1980)).

A second important guidepost is the recognition that any waiver of sovereign immunity must be narrowly construed. *See Allen v. Fauver*, 167 *N.J.* 69, 75, 768 *A.*2d 1055 (2001) ("Rules of strict statutory construction control" as to whether there has been a waiver of sovereign immunity). Furthermore, while "[t]he courts of this State have long followed a general rule of statutory construction that favors prospective application of statutes," *Gibbons v. Gibbons*, 86 *N.J.* 515, 521, 432 *A.*2d 80 (1981), "[w]hen considering whether a statute should be applied prospectively or retroactively, [the court's] quest is to ascertain the intention of the Legislature." *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 94 *N.J.* 473, 498, 468 *A.*2d 150 (1983).

Finally, when dealing with enactments which have been subsequently supplemented or amended, those later additions must, where possible, be read in harmony with the original statutory language. *City of Newark v. Rockford Furniture Co.*, 4 *N.J.Super.* 205, 208–09, 66 *A.*2d 743 (App.Div.1949). To glean the legislative intent regarding the interpretation of the Spill Act, the court is compelled to review its express statutory purposes and its history.

The New Jersey Legislature has expressly directed that Spill Act "be liberally construed to effect its purposes." *See N.J.S.A.*

58:10–23.11; *see also N.J. Dep't of Envtl. Prot. v. Dimant,* 212 *N.J.* 153, 161, 51 *A.*3d 816 (2012).

The purpose of the Spill Act is:

[T]o exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damages sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damaged by such discharges. . . .

[*N.J.S.A.* 58:10–23.11a.]

In 1979, the Legislature expanded the scope of Spill Act liability by amending it to provide that "any person who has discharged a hazardous substance, *or is in any way responsible* for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred." *N.J.S.A.* 58:10–23.11g(c)(1) (emphasis added). A "person" is defined by the statute to include "public or private corporations, companies, associations, societies, firms, partnerships, joint stock companies, individuals, the United States, *the State of New Jersey* and any of its political subdivisions or agents." *N.J.S.A.* 58:10–23.11b (emphasis added).

A "person" discharges a hazardous substance by "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State." *N.J.S.A.* 58:10–23.11b.

Originally, the Spill Act *did not expressly include* a right of contribution. However, in 1991, the Legislature amended the Act, once again, this time granting to any person who has discharged a hazardous substance, "a right of contribution against all other dischargers and persons *in any way responsible* for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance." *N.J.S.A.* 58:10–23.11f(a)(2) (emphasis added). Fur-

thermore, "the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of subsection c. of section 8 of *P.L.* 1976, *c.*141 (C.58:10–23.11g), and the contribution defendant shall have only the defenses to liability available to parties pursuant to subsection d. of section 8 of *P.L.* 1976, *c.*141 (C.58:10–23.11g)." *N.J.S.A.* 58:10–23.11f(a)(2). "In resolving contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate." *N.J.S.A.* 58:10–23.11f(a)(2).

Nonetheless, the Spill Act does provide governmental entities with some limited immunity:

> Any federal, State, or local governmental entity which acquires ownership of real property through ... eminent domain, condemnation or any circumstance in which the governmental entity involuntarily acquires title by virtue of its function as a sovereign, or where the governmental entity acquires the property by any means for the purpose of promoting the redevelopment of that property, shall not be liable, pursuant to subsection c. of this section or pursuant to common law, to the State or any other person for any discharge which occurred or began prior to that ownership.
>
> [*N.J.S.A.* 58:10–23.11g(d)(4).]

■ Even though the State has acknowledged both the Legislature's express intent to waive sovereign immunity under the Spill Act,[5] and the Supreme Court's decision in *Ventron, supra,* 94 *N.J.* at 473, 468 *A.*2d 150 upholding the retroactive application of the Act, the State posits that it should, nevertheless, be cloaked with immunity from liability for any discharge (or other offending

---

[5] Predictably, the State argues that consideration of public policy weighs heavily against abrogating the State's immunity for "pre-enactment discharges," positing that it is "extraordinary" and "unwarranted" to "suddenly let loose the floodgates [of litigation] 37 years after the Spill Act was passed and open the State to massive litigation and indefinite liability for hundreds of years of conduct." While the court is certainly mindful of such a potential burden, the paramount consideration, as with any type of statutory interpretation, is to discern the true legislative intent. *State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980). Since the court is satisfied that the Legislature, in its collective wisdom, expressly intended the State to be subject to the right of contribution, any further examination of potentially conflicting public policies is unwarranted.

action or omission) that occurred *prior* to the Act's enactment in 1977, because: (1) the Legislature did not clearly and unequivocally express its intent to waive immunity retroactively; and (2) any waiver of immunity must be strictly construed.

■ In *Ventron,* the Supreme Court considered whether the Spill Act could constitutionally be applied retroactively. *Id.* at 497, 468 *A.*2d 150. The trial court had concluded that the Act *did not* impose retroactive liability for the discharge of a pollutant into a state waterway. *Id.* at 487, 468 *A.*2d 150. In response, the Legislature immediately amended the Act to allow retroactive application of the Act's imposition of strict liability. *Id.* at 486–87, 468 *A.*2d 150; *see N.J.S.A.* 58:10–23.11g(c). As the Court explained, "[W]hen the Legislature has clearly indicated that a statute should be given retroactive effect, the courts will give it that effect unless it will violate the constitution or result in a manifest injustice." *Id.* at 498, 468 *A.*2d 150. Because "the Legislature has expressly declared that the Spill Act should be given retroactive effect," *id.* at 498, 468 *A.*2d 150, the Court imposed liability against the defendants even for actions that occurred prior to the effective date of the Act. *Id.* at 502–03, 468 *A.*2d 150. *See also Morton Int'l Inc. v. Gen. Accident Ins. Co. of Am.,* 134 *N.J.* 1, 8, 629 *A.*2d 831 (1993) ("We also held [in *Ventron]* that all the defendants were jointly and severally liable under the Spill Compensation and Control Act of 1977 ... and that such liability would apply retroactively to discharges that had occurred prior to the Spill Act's effective date.").

The State also argues that a remedial statute should not be given retrospective effect where there existed no remedy prior to the enactment of the statute, citing *Pennsylvania Greyhound Lines, Inc. v. Rosenthal,* 14 *N.J.* 372, 381, 102 *A.*2d 587 (1954). In *Rosenthal,* however, the Court explained:

The general rule is that statutes are to be deemed operative *in futuro* only; but, absent a clear indication of a legislative intent *contra,* a remedial and procedural statute is ... given retrospective effect "insofar as the statute provides a change in the form of remedy or provides a new remedy for an existing wrong. * * * Changes of procedure—*i.e.* of the form of remedies—are said to constitute an

exception, but that exception does not reach a case where before the statute there was no remedy whatever."

[*Ibid.* (quoting *Shielcrawt v. Moffett,* 294 *N.Y.* 180, 189, 61 *N.E.*2d 435 (Ct.App. 1945))].

Given the Legislature's express declaration of intent that the Spill Act should be given retroactive effect, *see Ventron, supra,* 94 *N.J.* at 498, 468 *A.*2d 150, the State's argument is unpersuasive.

From its inception, the Spill Act has defined a "person" to include "the State of New Jersey and any of its political subdivisions or agents," *N.J.S.A.* 58:10–23.11b, a rather strong expression of a legislative intent to subject the State to liability. Even so, the Legislature *expanded* the scope of the Act in 1979 by imposing strict liability on *"any person* who has discharged a hazardous substance or is in any way responsible for any hazardous substance," *N.J.S.A.* 58:10–23.11g(c)(1) (emphasis added); which plainly includes the State. Notably, the Legislature included no exception or exclusion for "the State of New Jersey and any of its political subdivisions or agents." *N.J.S.A.* 58:10–23.11b.

Moreover, in 1991, the Legislature once again amended the Act, this time to expressly include a right to seek and obtain a contribution from "all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance." *N.J.S.A.* 58:10–23.11f(a)(2). But once again, the Legislature declined to immunize or exclude "the State of New Jersey and any of its political subdivisions or agents" from the Act's reach. *N.J.S.A.* 58:10–23.11b.

Reading these enactments together, the Act is clear and unambiguous. The Legislature consciously intended the State to be subject to the Act. *See, e.g. Hous. Auth. of City of New Brunswick v. Suydam Investors, L.L.C.,* 177 *N.J.* 2, 19, 826 *A.*2d 673 (2003) (governmental entity will not enjoy immunity under Spill Act if entity causes or contributes to discharge of hazardous substances); *see also N.J. Transit Corp. v. Cat in the Hat, LLC,* 353 *N.J.Super.* 364, 373, 803 *A.*2d 114 (App.Div.2002) ("No immunity is bestowed

for any discharge which was caused by or contributed to by public entity."), *aff'd*, 177 *N.J.* 29, 826 *A.*2d 690 (2003).

### b. The Interplay Between The Spill Act And The Tort Claims Act

■ The State also maintains that the TCA provides it with immunity for discretionary actions, and mandates that potential claimants adhere to its procedural requirements, such as the notice of claim. In making this argument, the State relies almost exclusively on a single twenty-year old trial court opinion. *See Kenney v. Scientific, Inc.*, 204 *N.J.Super.* 228, 497 *A.*2d 1310 (Law Div.1985), *rev'd on other grounds*, 213 *N.J.Super.* 372, 517 *A.*2d 484 (App.Div.1986). In *Kenney*, ninety-five plaintiffs sued the owners and operators of multiple landfills and "waste generating" enterprises, alleging that environmental contamination at the landfills caused them to suffer property damage and various physical and emotional disabilities. *Id.* at 235, 497 *A.*2d 1310. Among the defendants sued by the plaintiffs was Edison Township, which purportedly owned and operated one of the landfills, and the State of New Jersey, due to its alleged failure to properly license and regulate the landfills and waste generators. *Id.* at 236, 497 *A.*2d 1310. Remarkably, the Spill Act was not raised by the pleadings as a potential source of liability. Instead, the plaintiffs only pursued the State on a theory of negligence, which claim the trial court held *was* subject to the TCA, stating rather obviously, that "[t]ort claims against public entities are governed by the Tort Claims Act." *Id.* at 236, 497 *A.*2d 1310. Notably, the landfill in *Kenney*, was not a State operation, whereas significant State involvement has been alleged in this case. Accordingly, even if it were controlling, which it is not, *Kenney* does not support, much less compel the conclusion that the Spill Act is subject to immunities enumerated in the TCA.

At least one federal court has likewise concluded that the substantive requirements of the TCA are inapplicable to the Spill Act. *See State of N.J. Dep't of Envtl. Prot. & Energy v. Gloucester Envtl. Mgmt. Servs., Inc.*, 821 *F.Supp.* 999, 1010 (D.N.J.1993).

There, the State and the NJDEP sought to compel multiple parties, including the past and present owners of the Gloucester Environmental Management Services, Inc. landfill, an EPA Superfund Site, to perform remedial activities to redress the conditions of the landfill under the Spill Act. *Id.* at 1002. Certain defendants filed third-party complaints against fifty-two municipalities, seeking contribution from them due to their alleged respective generation and disposal of hazardous substances at the landfill. *Id.* at 1002.

On a motion to dismiss the third-party complaints, the municipalities argued, that they were entitled to immunity under the TCA. Rejecting their claims of TCA immunity,[6] the court reasoned:

As to the statutory claims for contribution arising under the Spill Act ... the Legislature's 1976 enactment of the Spill Act expressly imposed liability upon municipalities. . . . It would be illogical to assume that the Legislature which created municipal liability for conduct violating the Spill Act in 1976 also meant to extend a blanket exemption to municipalities by force of the earlier Tort Claims Act. The more specific statute creating potential municipal liability under the Spill Act will not be nullified by the Tort Claims Act in the absence of a clear legislative intent to do so, because "where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."

[*Id.* at 1010–11 (quoting *Morton v. Mancari*, 417 *U.S.* 535, 550–51, 94 *S.Ct.* 2474, 41 *L.Ed.*2d 290 (1974)).]

 In point of fact, the Spill Act *has* been read in pari materia with other statutes. *See, e.g. Dep't of Envtl. Prot. v. Kafil*, 395 *N.J.Super.* 597, 602, 930 *A.*2d 457 (App.Div.2007) (the Spill Act "must be read *in pari materia* " with the Underground

---

[6] The State strains to undermine the persuasiveness of that decision, arguing that the court considered only whether the TCA provides public entities with "blanket" immunity under the Spill Act, rather than specific immunities, and that specific immunities, such as the public function immunities, should be read in pari materia with the Spill Act, although no published decisional authority was offered to support the proposition. Instead, the State submitted only a transcript from an unpublished trial court proceeding, which I received and considered, but found unpersuasive. *See R.* 1:36–3 ("No unpublished opinion shall constitute precedent or be binding upon any court.").

Storage Tank Act because the statutes deal "with closely related subject matters"). To achieve a unitary and harmonious whole, however, " '[s]tatutes are considered to be in pari materia when they relate to the same person or thing, to the same class of persons or things, or have the same purpose or object.' " *Marino v. Marino*, 200 *N.J.* 315, 330, 981 *A.*2d 855 (2009) (quoting *Sutherland on Statutory Construction* § 51:3 (7th ed. 2008)). This maxim of in pari materia is especially pertinent when " 'the statutes in question were passed in the same session.' " *Id.* at 330, 981 *A.*2d 855 (quoting *St. Peter's Univ. Hosp. v. Lacy*, 185 *N.J.* 1, 14–15, 878 *A.*2d 829 (2005)). "That is, '[s]tatutes *in pari materia* are to be construed together when helpful in resolving doubts or uncertainties and the ascertainment of legislative intent.' " *Id.* at 330, 981 *A.*2d 855 (quoting *In re Return of Weapons to J.W.D.*, 149 *N.J.* 108, 115, 693 *A.*2d 92 (1997)).

■ Nonetheless, "before undertaking an *in pari materia* analysis to discern legislative intent, the court must first decide whether the two statutes in question actually 'concern the same object.' " *Id.* at 330, 981 *A.*2d 855 (quoting *Sutherland, supra*, § 51:3). Relevant considerations are "whether both statutes were included in one enactment, whether the proofs required overlaps, and whether they are 'designed to serve the same purpose and objective.' " *Id.* at 330, 981 *A.*2d 855 (quoting *Sutherland, supra*, § 51:3) The New Jersey Supreme Court has cautioned, however, " '[t]he adventitious occurrence of like or similar phrases, or even of similar subject matter, in laws enacted for wholly different ends will normally not justify applying the rule' of *in pari materia* construction." *Id.* at 331, 981 *A.*2d 855 (quoting *State v. DiCarlo*, 67 *N.J.* 321, 325, 338 *A.*2d 809 (1975)).

■ The Spill Act and the TCA were enacted at different times for demonstrably different reasons. The Spill Act was enacted in 1976 as "a pioneering effort by the government to provide monies for a swift and sure response to environmental contamination." *Marsh v. N.J. Dep't of Envir. Prot.*, 152 *N.J.* 137,

144, 703 *A.2d* 927 (1997).[7] The TCA was enacted in 1972 "in response to mounting judicial disfavor with the doctrine of sovereign immunity." *Rochinsky v. State, Dep't of Transp.*, 110 *N.J.* 399, 404, 541 *A.2d* 1029 (1988).[8] One cannot reasonably suggest that the Spill Act and the TCA were "designed to serve the same purpose and objective." *Marino, supra,* 200 *N.J.* at 331, 981 *A.2d* 855. Because these two statutes were enacted "for wholly different ends," the application of in pari materia is unavailing.[9] *See Marino,* 200 *N.J.* at 331, 981 *A.2d* 855.

---

[7] The purpose of the Spill Act was "to exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damages sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damaged by such discharges...." *N.J.S.A.* 58:10-23.11a.

[8] The TCA states:

"The Legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity. On the other hand the Legislature recognizes that while a private entrepreneur may readily be held liable for negligence within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit and therefore the government should not have the duty to do everything that might be done. Consequently, it is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein."

[*N.J.S.A.* 59:1-2.]

[9] In the instant matter, the Legislature has expressly imposed liability on the State. Absent a specific declaration otherwise, it would be illogical to assume that the Legislature, which created State liability for conduct violating the Spill Act, also meant to extend specific exemptions from liability to the State "by force of the earlier Tort Claims Act." *Gloucester Envtl. Mgmt. Servs., supra,* 821 *F.Supp.* at 1011. I am unwilling to undermine the broad remedial purposes of the Spill Act, the more specific statute, "in the absence of a clear legislative intent to do so." *Id.* at 1011.

Indeed, allowing the substantive and/or notice requirements of the TCA to cloak the State with immunity would, essentially, preclude all liability, since almost all such decisions would fall under the State's discretionary function or

■ The State further argues, without any reference to established precedent, that the procedural requirements of the TCA, specifically the notice of claim, should operate to preclude the Spill Act claims. Since I am unable to discern any intent from the legislative history that would indicate a desire to make the procedure protection of the TCA applicable to claims brought under the Spill Act, I cannot abide the result urged by the State.[10]

### c. Failure to State a Claim

■ The State also maintains that the complaint fails to state a claim because the Spill Act does not impose liability for any of the acts or omissions alleged. Specifically, the State urges, "Where no action or omission of the State is directly responsible for a discharge, the State should not be liable merely because a discharge emanated from lands it owns and some alternative exercise of its regulatory powers could have prevented the discharge." NL counters that it has sufficiently alleged facts which, if true, demonstrate that the State is a "person" "in any way responsible" for the "discharge" of a hazardous substance under the Spill Act.[11]

---

other provisions of the TCA. Such a construction would effectively negate the legislative definition of a "person" under the Spill Act, plainly an untenable result.

[10] In support of it contention that the TCA does not immunize the State's conduct under the Spill Act, NL analogizes the Spill Act to the New Jersey Civil Rights Act ("CRA"), as to which the New Jersey Supreme Court rejected a similar argument:

Given that stark field of case law universally rejecting the importation of the TCA's notice-of-claim requirement into other statutory claims, or for any constitutional claim, we think that the Legislature would have spoken expressly on the subject had it intended that the TCA's notice requirement serve as a prerequisite to a CRA cause of action.... In light of the broad remedial purpose of the CRA, and absent any legislative expression to the contrary, we are unconvinced that the Legislature chose to condition the rectifying of an infringement on an individual's vital constitutional rights, or of injurious discriminatory conduct, on satisfaction of the TCA's notice-of-claim requirement.

[*Owens v. Feigin*, 194 N.J. 607, 613–14, 947 A.2d 653 (2008).]

[11] NL also contends that the State owns the riparian lands in a public trust, and thus, the State is liable under the Spill Act. In response, the State offers a

The Spill Act imposes strict liability on "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance." *N.J.S.A.* 58:10–23.11g(c)(1).[12] After the 1979 amendment, "[n]o longer was liability limited to those who were active participants in the discharge of hazardous substances." *Dimant, supra,* 212 *N.J.* at 175, 51 *A.*3d 816. In that connection, the plain language of the Spill Act does not expressly distinguish between public and private actors, and thus does not limit the State's liability to an action or omission where the State is directly responsible for a discharge.

In determining whether a contributing party may be held liable, the New Jersey Supreme Court has set forth a two-prong nexus test. *Id.* at 177, 51 *A.*3d 816. The first prong "requires some connection between the discharge complained of and the alleged *discharger.*" *Id.* (Emphasis in the original). The nexus requirement concerns "the distinctly separate question about holding liable a party who was not directly responsible for the discharge that had occurred, but who nevertheless had some control

---

public policy argument that riparian lands should be treated differently than other lands owned by the State because of the State's unique roles, obligations, and resource constraints. "Riparian lands are lands lying along the banks of a stream or water body." *Panetta v. Equity One, Inc.*, 190 *N.J.* 307, 318, 920 *A.*2d 638 (2007). "The public trust doctrine acknowledges that the ownership, dominion and sovereignty over land flowed by tidal waters, which extend to the mean high water mark, is vested in the State in trust for the people." *Matthews v. Bay Head Improv. Ass'n*, 95 *N.J.* 306, 312, 471 *A.*2d 355 (1984). "The public trust doctrine is premised on the common rights of all the State's citizens to use and enjoy the tidal land seaward of the mean high water mark." *Lusardi v. Curtis Point Prop. Owners Ass'n*, 86 *N.J.* 217, 228, 430 *A.*2d 881 (1981). Given my conclusion that the pleadings adequately state a claim, I need not address NL's alternative theory of the case.

12 The statute defines "discharge" as

"any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State." [*N.J.S.A.* 58:10–23.11b.]

over the direct discharger in each matter." *Id.* at 176, 51 *A.*3d 816. The second prong is that "[a] nexus also must be demonstrated to exist between the discharge for which one is responsible—in any way—and the contaminated site for which cleanup and other related authorized costs are incurred." *Id.* at 177, 51 *A.*3d 816.

In the instant matter, at this early stage of litigation, NL has sufficiently alleged facts to support its contention that the State is a person "in any way responsible for a hazardous substance" under the Spill Act, because the State: (1) played a significant part in the planning and authorization of the construction of the seawall and the western jetty; (2) had actual knowledge that Sea–Land intended to use the slag at the RBS site; (3) was actively operating and maintaining the project, which was supplemented by the addition of the seawall; and (4) did not intervene to prevent or abate the environmental risk after the State was notified of the potential harms. As such, it has pleaded the existence of an adequate nexus between the construction of the seawall and the western jetty on the one hand, and the actions or omissions of the State on the other. While the State may not be "directly responsible for the discharge that had occurred, [it] nevertheless had some control over [Sea–Land] in each matter." *Id.* at 176, 51 *A.*3d 816.

III. Conclusion

For the reasons set forth in this opinion, the State's motion to dismiss is denied.