# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ASHLAND LLC, INTERNATIONAL SPECIALTY PRODUCTS INC., ISP ENVIRONMENTAL SERVICES INC., and ISP CHEMCO LLC, | ) ) ) ) ) | |
| Plaintiffs/Counterclaim Defendants, | ) ) ) | |
| v. | ) ) | C.A. No. N15C-10-176 EMD CCLD |
| THE SAMUEL J. HEYMAN 1981 CONTINUING TRUST FOR LAZARUS S. HEYMAN, et al., | ) ) ) ) ) | |
| Defendants/Counterclaim Plaintiffs. | ) ) | |

Submitted: December 15, 2016
Decided: March 30, 2017

*Upon Plaintiffs' Motion to Dismiss Certain of Defendants' Counterclaims*
***GRANTED in part and DENIED in part***

Christopher Viceconte, Esquire, Gibbons P.C., Wilmington, Delaware, and Michael R. Griffinger, Esquire, William S. Hatfield, Esquire, and Camille V. Otero, Esquire, Gibbons P.C., Newark, New Jersey. *Attorneys for Ashland LLC, International Specialty Products, Inc., ISP Environmental Services, Inc., and ISP Chemco LLC*

Kevin G. Abrams, Esquire, John M. Seaman, Esquire, and April M. Ferraro, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware, and Andrew J. Rossman, Esquire, Jonathan B. Oblak, Esquire, and Sylvia E. Simson, Esquire, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York. *Attorneys for The Samiel J. Heyman 1981 Continuing Trust for Lazarus S. Heyman, et al.*

**DAVIS, J.**

# I. INTRODUCTION

This breach of contract case stemming from environmental liability allocation is assigned to the Complex Commercial Litigation Division of this Court. Plaintiffs[1] Ashland LLC, International Specialty Products, Inc. ("ISP"), ISP Environmental Services Inc. ("IES"), and ISP Chemco LLC ("Chemco") filed this declaratory judgment and breach of contract case against Heyman Defendants—The Heyman Seller Defendants, The Heyman Trust Defendants, and Linden Property Holdings LLC ("LPH").[2]

# II. BACKGROUND FACTS[3]

The disputed property (the "Linden Property") is located at 4000 Road to Grasselli, Linden, New Jersey.[4] The Linden Property has a chemical manufacturing history. For many years, non-party GAF Chemicals Corporation ("GAF Chemicals"), and its predecessors, owned and operated the Linden Property.[5]

On June 16, 1989, GAF Chemicals and the New Jersey Department of Environmental Protection ("NJDEP") entered into an Administrative Consent Order (the "ACO") regarding environmental contamination and cleanup at the Linden Property.[6] GAF Chemicals agreed "to

---

[1] Plaintiffs collectively will be called Ashland unless specificity is required. Plaintiff Chemco is a subsidiary of Plaintiff ISP. Plaintiff IES is a subsidiary of Plaintiff Chemco.

[2] The Court is initially using the definitions used by the parties in various pleadings. The Court will use the term "the Heyman Defendants" collectively unless specificity is required—*i.e.*, LPH or alike.

[3] Unless otherwise indicated, the following are the Relevant Facts as alleged in the counterclaims portion of the Defendants' Answer to the First Amended Complaint and Counterclaims (the "Counterclaims"). For purposes of the Motion, the Court must view all well-pleaded facts alleged in the Complaint as true and in a light most favorable to the Heyman Defendants. *See, e.g., Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, C.A. No. 09C-09-136 JRS, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010). The Court may also cite to portions of the Ashland's First Amended Complaint to the extent such a fact is not contested or otherwise material to the Civil Rule 12(b) decision on the MTD Motion. The Court will be doing this to present a more complete factual background.

[4] Defs.' Countercls. ¶ 1 (Ashland uses the definition of the Linden Property contained in the SPA. The Heyman Defendants refer to the Linden Property as "Block 587, Lots 1 and 2.1, in the City of Linden, Union County, New Jersey (the 'LPH Site' or 'LPH Property')." So as to maintain consistency with other orders and opinions issued by the Court, the Court will use the term Linden Property.

[5] *Id.* ¶ 24.

[6] *Id.* ¶ 37. *See also* Pls.' Compl. Ex. B.

conduct a remedial investigation and feasibility study of remedial action alternatives" and

"designate and implement a remedial action alternative to remedy any and all pollutions at the

[Linden Property], emanating from the [Linden Property], or which has emanated from the

[Linden Property]."[7] All operations at the Linden Property ceased in 1991.[8]

In 1991, GAF Chemicals incorporated ISP as one of its subsidiaries and incorporated IES

as ISP's subsidiary.[9] GAF Chemicals then transferred ownership of the Linden Property to

IES.[10] As such, IES became the entity responsible for the ACO.[11] In 1996, the Heyman

Defendants spun off ISP (and IES) from GAF Chemicals.[12] GAF Chemicals and ISP entered

into an Indemnification Agreement, outlining their post-spin off indemnification obligations.[13]

In 2006, Chemco executed an Administrative Consent Order Amendment (the "Amended

ACO") with the NJDEP.[14] The Amended ACO did not replace the ACO. Instead, the Amended

ACO supplemented and became a part of the ACO.[15] The Amended ACO expressly provided

that IES would continue to comply with the terms of the ACO.[16]

### The Sale and Closing

In 2011, Ashland acquired ISP, IES, and Chemco from the Heyman Defendants for $3.2

billion.[17] This was done through a Stock Purchase Agreement, dated as of May 31, 2011 (the

---

[7] *Id.*
[8] *Id.* ¶25.
[9] *Id.* ¶ 26.
[10] *Id.* ¶ 28.
[11] *Id.* ¶¶ 27 and 29.
[12] *Id.* ¶ 29.
[13] *Id.* ¶ 21
[14] *Id.* ¶ 45. *See also* Pls.' Compl. Ex. C, ¶ 4 (the Amended ACO).
[15] Pls.' Compl. Ex. C at ¶ 9 ("This ACO Amendment is intended to supplement the existing 1989 ACO. The provisions of this ACO Amendment shall become part of the 1989 ACO. The 1989 ACO, as amended, shall remain in full force and effect and [IES] shall continue to comply with the 1989 ACO."). *See also id.* at ¶ 15 ("By the execution of this ACO Amendment, NJDEP does not release any person from any liabilities or obligations such person may have pursuant to any other applicable authority, nor does NJDEP waive any of its rights or remedies pursuant thereto.").
[16] *Id.*
[17] Defs.' Countercls. ¶ 46.

"SPA") between the Heyman Defendants (as the "Seller Parties") and Ashland (as the "Buyer").[18] The Heyman Defendants wanted to retain the Linden Property. So, on August 23, 2011, immediately after the SPA closed, IES conveyed the Linden Property back to the Heyman Defendants for one dollar.[19] Defendant LPH operates the Linden Property.[20]

The SPA set out the parties' respective obligations regarding the Linden Property. SPA Section 2(e) to Schedule 5.19 of the SPA[21] states:

> In connection with the Linden Transfer, the Seller Parties shall assume all Liabilities to the extent related to or arising from or existing at the Linden Property, including Liabilities arising under or relating to (i) Environmental Laws, provided that such Liabilities shall not include any off-site migration or disposal of Hazardous Materials from the Linden Property prior to the Closing, any claims or damages associated with any off-site migration or disposal of Hazardous Material from the Linden Property prior to the Closing, and for the avoidance of doubt, any off-site contamination of soils, groundwater or sediments, any third party superfund sites including the Newark Bay Complex, any natural resources damages or exposure claims relating to operations or discharges prior to Closing,...or (v) the Linden Transfer (including any Liabilities to the extent arising by virtue of the delivery of a limited warranty deed, but excluding any Liabilities arising out of or relating to fraudulent conveyance or similar liability), in each case, other than as set forth in the proviso in clause (i) above, whether arising before, on or after the Closing Date (the "Linden Excluded Liabilities").[22]

SPA Section 2(f) also discusses the Linden Property transaction—specifically the "Linden Transfer"[23]—and states:

> In connection with the Linden Transfer, the Seller Parties shall be responsible, at their sole cost and expense, for compliance, if applicable, with any requirements of the Industrial Site Recovery Act ("ISRA") and, if ISRA applies to the Linden Transfer, Seller Parties shall (i) within five (5) Business Days after execution of this Agreement, make any required filings or notifications (such as a General Information Notice, as defined under ISRA) to the [NJDEP], and (ii) use reasonable best efforts to, prior to closing, make all other filings, undertake all other measures, including where required undertaking any site investigation or

---

[18] *Id.*
[19] *Id.* ¶ 50; *see also* Pls.' Compl. ¶ 60.
[20] Defs.' Countercls. ¶ 52.
[21] Any further reference to SPA Sections 2 and 4 of Schedule 5.19 of the SPA will omit reference to Schedule 5.19 and will be as "SPA Section 2_" or SPA Section 4_."
[22] Pls.' Compl. Ex. A, p. 14. (emphasis in original).
[23] The "Linden Transfer" is defined in SPA Section 2(a). *See* Pls.' Compl. Ex. A, p. 14.

4

Remedial Action required by ISRA. In addition, the [SPA] Seller Parties shall use reasonable best efforts to amend any consent decree or other binding agreement with any Governmental Entity relating to the Linden Excluded Liabilities, and to replace or substitute any related financial assurance (including any bond or letter of credit), to include the name of the Linden Transferee following the Linden Transfer and, if permitted by NJDEP, to remove the name of ISP or any of the Companies therefrom.[24]

Paragraph 2 of the Contribution Agreement mirrors SPA Section 2(e).[25] That is, LPH, whose membership interests were transferred from Ashland to the Heyman Defendants, became responsible for:

All liabilities to the extent related to or arising form or existing at the Linden Property, including Liabilities arising under or relating to (a) Environmental Laws (provided that such Liabilities shall not include any off-site migration or disposal of Hazardous Materials from the Linden Property prior to the Closing, any claims or damages associated with any off-site migration or disposal of Hazardous Material from the Linden Property prior to the Closing, and for the avoidance of doubt, any off-site contamination of soils, groundwater or sediments, any third party superfund sites including the Newark Bay Complex, any natural resources damages or exposure claims relating to operations or discharges prior to Closing).[26]

### The Trusts' Post-closing Activity

On July 18, 2011, prior to closing, IES notified NJDEP of the pending Linden Property transfer, and advised NJDEP that IES (or any ISP affiliate) would not be associated with the Linden Property after August 25, 2011.[27]

LPH performed some affirmative duties under the ACO. It replenished the outstanding letter of credit.[28] It made payments to New Jersey to comply with its portion of the ACO.[29] And, it applied for Remedial Action Permits ("RAPs") for soil and groundwater at the Linden

---

[24] *Id.*
[25] Defs.' Countercls. ¶ 51.
[26] *Id.*
[27] *Id.* ¶ 62. *See also* Pls.' Compl. Ex. D.
[28] Defs.' Countercls. ¶ 60.
[29] *Id.* ¶ 60.

5

Property.[30] On February 17, 2012, NJDEP issued RAPs for soil and groundwater at the Linden Property to LPH only.[31]

On July 3, 2012, LPH's Environmental Compliance manager requested from NJDEP a full satisfaction compliance letter.[32] On December 23, 2013, NJDEP denied LPH's full compliance request.[33] NJDEP's letter specifically required an investigation, ecological risk assessment, and remediation of off-site contamination.[34] This letter also noted that (i) LPH had no standing under the ACO as LPH was not an ordered party, and (ii) IES had full responsibility for the ACO under the Amended ACO.[35]

On January 21, 2014, LPH responded to NJDEP's December 23, 2014 letter. LPH explained who was responsible for the Linden Property after the closing on the SPA.[36] This appears to be the first time that LPH disclosed that IES transferred the Linden Property to LPH, and LPH had taken over on-site responsibilities.[37] LPH also alleged that IES was responsible for any off-site remediation pursuant to the ACO.[38] On April 9, 2014, LPH again wrote to the NJDEP. LPH argued that it agreed to assume on-site liabilities, while Ashland assumed off-site liabilities pursuant to the ACO.[39] Further, LPH argued that all on-site remediation was complete.[40]

---

[30] *Id.* ¶ 61.
[31] *Id.*
[32] *Id.* ¶ 63. *See also id.* Ex. 26.
[33] *Id.* ¶ 65. *See also id.* Ex. 26.
[34] *Id.*
[35] *Id.*
[36] *Id.* ¶ 66.
[37] *Id.*
[38] *Id.*
[39] *Id.* ¶ 68.
[40] *See id.*

On July 21, 2015, the NJDEP sent Ashland and GAF (and its successors) a Demand for Stipulated Penalties for the parties' collective failure to comply with the ACO.[41]

### *The Litigation*

Ashland commenced this action on October 20, 2015, and filed its First Amended Complaint (the "Complaint") on December 3, 2015. The Complaint alleges five causes of action relating to purported obligations of the Defendants in connection with Schedule 5.19 of the SPA and purported responsibility for the investigation, remediation, and cleanup costs regarding environmental contamination of the Arthur Kill, an off-site location. Relevant here, Count I of the Complaint is a Declaratory Judgment – Breach of Contract claim asserted by Ashland against the Heyman Parties for, among other things, the purported breach of Section 2(f) of Schedule 5.19 of the SPA. Among other things, Count I alleges that the Defendants' failure to amend the ACO to include the name of LPH and remove ISP and its subsidiaries therefrom is in breach of Section 2(f).

On January 6, 2016, the Heyman Defendants filed their Answer to the Complaint and Counterclaims (the "Counterclaims"). The Counterclaims lay out six causes of action related to the same off-site liabilities. Counterclaim I is a declaratory judgment action. The Heyman Defendants request the Court use its declaratory judgment power to declare that IES assumed clean-up responsibility under the 1991 Assumption Agreement. In Counterclaims II and III, the Heyman Defendants assert claims for breach of contract and a declaratory judgment relating to breach of contract. These counterclaims request the Court specifically outline the parties' responsibilities under SPA Sections 2(e) and 2(f) of Schedule 5.19 of the SPA and/or assess damages for the breach of these provisions. Counterclaim IV is a claim for breach of the implied covenant of good faith and fair dealing. The Heyman Defendants allege that Ashland acted in

---

[41] *Id.* ¶ 73.

7

bad faith by refusing to comply with SPA Sections 2(e) and 2(f). LPH seeks relief in Counterclaims V and VI. Counterclaim V is a Spill Act claim. Counterclaim VI is an indemnification claim. LPH alleges that, pursuant to the 1996 Indemnification Agreement, Ashland must indemnify LPH for any and all costs, including penalties, assessed by NJDEP.

On February 25, 2016, Ashland filed its Plaintiff/Counterclaim Defendants' Motion to Dismiss Certain of Defendants' Counterclaims (the "MTD Motion"). Ashland moved to dismiss, in all or in part, all six of the Counterclaims. First, Ashland argues that Counterclaim I must be dismissed because the Heyman Defendants improperly seek a declaration of the parties' rights pursuant to the Assumption Agreement because none of the Defendants was a party to the Assumption Agreement. Second, Ashland contends that Counterclaims II and III must be dismissed as to LPH because LPH was not a party to the SPA. Ashland also claims that Counts II and III as to the remaining Heyman Defendants must be dismissed because they were not a party to the Contribution Agreement. Third, Ashland argues the Heyman Defendants fail to plead a breach of the implied covenant of good faith and fair dealing. Fourth, Ashland contends that LPH fails to properly plead a Spill Act claim and, therefore, this claim must be dismissed. Fifth, Ashland claims that LPH may not bring a claim for breach of the Indemnification Agreement, because it was not a signatory. Finally, Ashland argues that, to the extent LPH makes a claim pursuant to the Contribution Agreement in any Counterclaim (specifically Counterclaims II and III), those claims must be heard before an arbitrator as the Contribution Agreement contains a mandatory arbitration provision which divests this Court of jurisdiction.

On April 25, 2016, the Heyman Defendants filed their Counterclaim Plaintiffs' Opposition to Counterclaim Defendants' Motion to Dismiss Certain Counterclaims (the "Opposition"). The Heyman Defendants argue that they may bring a declaratory judgment

8

action to determine IES's rights and obligations under the Assumption Agreement because their rights are affected.[42] The Heyman Defendants also contend that Counterclaims II and III should remain because the two contracts at issue, the SPA and the Contribution Agreement, are inextricably linked. As to Counterclaim V, the Heyman Defendants contend that they have pled a reasonable set of circumstances regarding their Spill Act claim to stave off dismissal. Further, the Heyman Defendants argue that Counterclaim IV, their implied covenant of good faith claim, should survive dismissal because they have adequately pled an implied covenant which Ashland breached. Last, the Heyman Defendants argue that LPH may bring its Indemnification Agreement claim because LPH was an assignee of the Indemnification Agreement's signatories.

The Court heard oral argument on October 4, 2016. At the close of the hearing, the Court took the MTD Motion under advisement. The parties submitted post-trial briefing and sur-replies in November, completing the process on December 15, 2016. This is the Court's decision on the MTD Motion.

## III. STANDARD OF REVIEW—MOTION TO DISMISS

Upon a motion to dismiss under Civil Rule 12(b)(6), the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[43] However, the Court must "ignore conclusory allegations that lack specific supporting factual allegations."[44]

---

[42] See 10 *Del. C.* § 6501.
[43] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy*, No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[44] *Ramunno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998).

# IV. DISCUSSION

## A. DECLARATORY JUDGMENT REGARDING THE ASSUMPTION AGREEMENT WILL NOT MOVE LITIGATION FORWARD

The Delaware Declaratory Judgment Act provides that "any person . . . whose rights, status, or other legal relations are affected by a . . . contract . . . may have determined any question of construction or validity arising under the . . . contract[.]"[45] The Heyman Defendants contend that the Court has the power to declare their rights in conjunction with the Assumption Agreement signed by ISP and GAF Chemicals Corporation. Ashland argues, without citing any case law, that the Heyman Defendants lack standing.

This claim seems non-controversial. The Heyman Defendants seek the Court to declare that IES, as successor, assumed obligations under the Assumption Agreement. Ashland agrees.[46] To the extent the Heyman Defendants seek a declaration that IES (and Ashland) assumed all off-site obligations, they seek the same claims in their breach of contract claim. The Court finds that exercising its discretion under Delaware's Declaratory Judgment Act would not fruitfully move this matter forward. The parties' dispute revolves around the SPA and SPA Sections 2(e) and 2(f), not the Assumption Agreement—i.e., the purported "actual and justiciable" controversy raised in Paragraph 82 of the Counterclaims is the dispute between Ashland and the Heyman Defendants asserted in Counterclaims II and III. As such, the Court will grant the MTD Motion as to Counterclaim I.

---

[45] 10 Del C § 6502.

[46] *See* Plaintiffs' Compl. ¶ 40 ("GAF Chemicals Corporation transferred ownership of the [Linden Property] to IES in 1991."). *See also id.* ¶ 41 ("Upon information and belief, the [Trusts] or their predecessor(s) created IES, arranged for the transfer of the [Linden Property] to IES, and volunteered IES to complete the remediation required by the ACO so that the remediation under the ACO could be completed and the [Linden Property] made suitable for redevelopment.").

10

## B. The SPA and Contribution Agreements are Related, and Must be Read Together

Ashland argues, without citing to authority, that LPH may not bring a claim because it did not sign the SPA. The Court finds that LPH and the Heyman Trusts have standing to bring claims pursuant to the SPA and the Contribution Agreement. Section 9.3 of the SPA provides that the SPA "shall be binding upon and inure to the benefit of the parties hereto and their respective successors, legal representatives and permitted assigns."[47] Section 2(a) of Schedule 5.19 of the SPA, as amended, plainly states that:

> [Ashland] shall cause [ISP and its Subsidiaries] to, (i) immediately following the Closing, *assign*, transfer, convey and deliver *to [LPH]* . . . , a Delaware limited liability corporation (the "Linden Subsidiary") formed by [IES] . . . *all right, title and interest of the Companies in and to the following assets (and no other assets)*: (A) the Linden Property, (B) any rights to receive the proceeds of any insurance policies covering the Linden Property, (C) any Contracts to the extent related to operation of the Linden Property and (D) any personal property assets located thereon . . . by limited warranty deed, and (ii) immediately following the actions contemplated by subclause (i), assign, transfer, convey and deliver to the Seller Parties or their designee (the "Linden Transferee") the Linden Subsidiary ((i) and (ii) collectively, the "Linden Transfer").[48]

The parties clearly contemplated that LPH was coming into existence, and it would have rights pursuant to the SPA. As set forth below, the Court finds that LPH may pursue its breach of contract claim under the SPA.

At this stage in the proceedings, the Court also finds that the SPA and the Contribution Agreement must read in conjunction with another. The Court understands that these are two separate agreements and that the agreements were not executed simultaneously; however, the sale of the Linden Property to LPH is contemplated in and part of the SPA transaction. SPA Section 5.19 refers the parties to SPA Schedule 5.19. SPA Schedule 5.19 contains SPA Section

---

[47] Counterclaims Ex. 2 at 99.
[48] *Id.* Ex. 19 at 3 (emphasis added).

2(a), and Section 2(a) above contemplates creating LPH. The Contribution Agreement is, in part, the device that Ashland used to sell the Linden Property to LPH.

Delaware law allows for agreements related to the same business transaction and subject matter, and entered into in close temporal proximity of one another, to be read together as one overall agreement.[49] The Court, by doing this, is not saying that it will treat the Contribution Agreement and the SPA as one document or contract. Instead, the Court sees that the SPA contemplates sale of stock of the entity which owned the Linden Property to Ashland and the later conveyance of the Linden Property back to LPH. This is part of an overall agreement. Ashland's argument about the three months between closing on the SPA and the sale of the Linden Property is too technical and narrow, and seems to purposefully ignore part of the purpose of the SPA.[50]

The SPA dictated the assignment of all rights, title, and interests in the Linden Property (SPA Schedule 5.19) and thus the assignment set forth in, and effectuated by, the execution of the Contribution Agreement.[51] In fact, the Contribution Agreement expressly stated it was being entered into "as required by Section 5.19 and Schedule 5.19 of the [SPA] and in satisfaction of such requirements," and contained an integration clause that stated as follows: "[this] Agreement . . . , together with the [SPA] . . . , the other Ancillary Agreements and the Deed, contains the entire agreement between the parties hereto with respect to the subject matter hereof."[52] Because the two agreements are intertwined, the Court finds that the SPA and the Contribution

---

[49] *See, e.g., E.I. du Pont de Nemours & Co. v. Shell Oil Co*, 498 A.2d 1108, 1115 (Del. 1985) (finding that the specific terms of two agreements and the "interrelationship thereof ma[d]e it clear that the parties intended [them] to operate as two halves of the same business transaction.").

[50] The Court says "part" of the purpose as, obviously, the SPA does more than deal with the Linden Property— among many other things, the SPA deals with stock sales ("ISP and its subsidiaries") and the transfer of the Wayne Property.

[51] *See* Counterclaims Ex. 18 at 12–13 (Section 2(a) of Schedule 5.19 of the SPA), Ex. 19 at 3 (amending Section 2(a) of Schedule 5.19 of the SPA).

[52] *Id.* Ex. 20 at 1, 4.

12

Agreement must be read together as part of a single agreement. The Court will, therefore, deny the MTD Motion to the extent it seeks to have Counterclaims II and III dismissed as to LPH.

The Court will also deny the MTD Motion as to its jurisdiction/arbitration argument regarding lack of jurisdiction as to the Contribution Agreement. Ashland initiated this civil action. Ashland is suing the Heyman Defendants, including LPH, in connection with SPA Section 5.19, SPA Schedule 5.19 and the provisions of SPA Schedule 5.19 (*i.e.*, SPA Sections 2(e) and 2(f)). Section 2 of the Contribution Agreement mirrors, with exceptions, SPA Section 2(e).

The Court recognizes the existence of the binding arbitration provision of the Contribution Agreement and understands the importance of upholding such provisions.[53] However, Ashland engaged LPH in this Court on LPH's obligations under SPA Section 5.19, SPA Schedule 5.19 and the ACO. The Heyman Defendants asserted Counterclaims II and III which include similar claims under the SPA and the Contribution Agreement. Now, Ashland argues that LPH and the other Heyman Defendants must sever any of their SPA claims from the Contribution Agreement claims. Ashland's position would promote inefficiencies and could provide for inconsistent results (this Court's determinations as to the ACO and off-site migration liability under the SPA and the New York JAMS arbitration panel (using Delaware law) on the same issue but as to the Contribution Agreement). This is not an instance where LPH and the Heyman Defendants are trying to take advantage of the situation and assert a separate and unrelated claim. Ashland initiated the litigation and the Heyman Defendants asserted the Counterclaims. As such, the Court agrees with and will apply the legal principle that to send claims arising from one agreement (the Contribution Agreement) elsewhere (New York JAMS

---

[53] *See, e.g., NAMA Holdings, LLC v. Related World Mkt. Ctr.*, LLC, 922 A.2d 417 (Del. Ch. 2007).

13

arbitration panel) while keeping claims from another related agreement (the SPA) here in this Court would result in obvious inefficiencies and confusion.[54]

## C. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING MUST BE DISMISSED

The Heyman Defendants contend in Counterclaim IV that Ashland breached the implied covenant of good faith and fair dealing. The Heyman Defendants argue that Ashland owes them a duty to refrain from arbitrary or unreasonable conduct which prevents another from receiving the fruits of their bargain.

The implied covenant of good faith and fair dealing cannot be used to grant contractual protections that parties forwent at the bargaining table.[55] The covenant is not a license to rewrite contractual language.[56] A party generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement.[57]

If the facts underlying Counterclaims II and III are proven, the Heyman Defendants will get the same relief sought in Counterclaim IV – damages (or a declaration of rights) related to breach of the conditions of SPA Section 5.19 and Schedule 5.19's SPA Sections 2(e) and 2(f). The Court finds that the Heyman Defendants have not pleaded a valid claim for breach of an implied covenant of good faith and fair dealing as the Heyman Defendants have not alleged any implied contractual terms. Instead, the Heyman Defendants pursued a counterclaim for breach of an implied covenant where the conduct is already specifically addressed in the SPA. The Heyman Defendant's Counterclaim IV arises from the parties' disagreement over the interpretation of the SPA and its allocation of liabilities. Therefore, this issue is better suited for

---

[54] See Ashall Homes Ltd. v. ROK Entm't Grp., Inc., 992 A.2d 1239, 1251 (Del. Ch. 2010) (dismissing case in Delaware for litigation in English courts where, in part, important policy reasons (avoiding inefficiencies and confusion) supported adjudicating disputes over multiple agreements that were separate parts of a single integrated scheme in one court).

[55] See Aspen Advisors LLC v. United Artists Theatre Co., 861 A.2d 1251, 1260 (Del. 2004).

[56] Nemec v. Shrader, 991 A.2d 1120, 1126 (Del. 2010).

[57] Id. at 1125–26.

14

the Heyman Defendants' breach of contract claims asserted in Counterclaims II and III. Accordingly, the Court will grant the relief requested in the MTD Motion and dismiss Counterclaim IV.

## D. SPILL ACT LIABILITY CLAIM REMAINS

Ashland moves to dismiss Counterclaim V—LPH's Spill Compensation and Control Act (the "Spill Act") Claim.[58] Ashland argues that LPH fails to allege any facts that Ashland ever discharged any hazardous substance on the Linden Property. And, Ashland never owned or operated the Linden Property. LPH counters that Ashland, as parent to ISP, IES, and Chemco, as historical owners of the property, may all be liable under the Spill Act.

The Spill Act imposes liability on: "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard for fault, for all clean up and removal costs no matter by whom occurred."[59] Discharge means, "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting or dumping of hazardous substances into the waters or onto the lands of the State[.]"[60] New Jersey Courts interpret "in any way possible" as liberal as possible to effect the Spill Act's purpose.[61] Liability may arise even if operations on a property have ceased.[62] So, it makes no difference at this stage that operations ceased on the Linden Property in 1991.

Spill Act lawsuits often require experts to determine what hazardous substances have been discharged, the extent to which they have been discharged, and to apportion liability if

---

[58] N.J.S.A. 58:10-23.11 et seq.
[59] *Id.* 58:10-23.11g(c)(1).
[60] *Id.* 58:10-23.11b.
[61] *See, e.g., State, Dept. of Environmental Protection v. Ventron Corp.,* 468 A.2d 150, 165 (N.J. 1983).
[62] *Marsh v. New Jersey Dept. of Environmental Protection,* 703 A.2d 927 (N.J. 1997) (holding a landowner liable for gasoline leakage even though the gas stations ceased to exist prior to the landowner's obtaining the property).

15

necessary. Discovery is ongoing. LPH has adequately pled that Ashland and ISP are the direct or indirect parents of IES, who owned the Linden Property for more than two decades.[63] And, LPH has alleged that Chemco was IES's financial guarantor during IES's ownership period.[64] As noted, the Spill Act's scope of liability is broad, and may encompass anyone "in any way responsible." At this stage, the Court must accept LPH's allegations as true. With that, the Court cannot hold that the Heyman Defendants would not be entitled to recover under any reasonably conceivable set of circumstances on their Spill Act Claim. Although Counterclaim V may not survive the summary judgment, the Court will not dismiss Counterclaim V as failing to state a claim upon which relief can be granted under Civil Rule 12(b).

### E. LPH's Declaratory Judgment Claim regarding the Indemnification Agreement Fails

Last, Ashland moves to dismiss LPH's Counterclaim VI, which is a declaratory judgment claim as to the Indemnification Agreement. In Counterclaim VI, LPH seeks that the Court declare Ashland may have to indemnify LPH for losses associated with the Linden Property. LPH argues that a 1996 Indemnification Agreement between ISP and GAF Chemicals Corporation encompasses this dispute.

In 1996, GAF Chemicals Corporation and ISP executed an Indemnification Agreement.[65] Article 2.2(b)(1) of the Indemnification Agreement states:

> ISP Holdings shall indemnify, defend and hold harmless the GAF Group and each of their respective Representatives and Affiliates from and against all ISP Holdings Liabilities and any and all indemnifiable Losses of the GAF Group and each of their respective Representatives and Affiliates arising out of or due to, directly or indirectly, the ISP Holdings Liabilities, whether such ISP Holdings Liabilities arose before, or arise after, the Spin Off Date.[66]

---

[63] *See* Counterclaims ¶¶ 20-22, 28, 52.
[64] *Id.* ¶ 30.
[65] Defendants' Answers/Counterclaims Ex. 21.
[66] *Id.* at 6.

Conversely, Article 2.2(a)(1) says that:

> GAF and G-I Holdings shall jointly and severally indemnify, defend and hold harmless ISP Holdings, its Post Spin Subsidiaries and **each of their respective present and future Representatives and Affiliates** from and against all GAF Liabilities and all Indemnifiable Losses of ISP Holdings, its Post Spin Subsidiaries and each of their respective Representatives and Affiliates arising out of or due to, directly or indirectly, the GAF Liabilities, whether such GAF Liabilities arose before, or arise after, the Spin Off Date.[67]

"GAF Group" included "Affiliates" of GAF.[68] "ISP Holdings Liabilities" included "all Liabilities of ISP and its subsidiaries."[69] "Liabilities" was defined as "all debts, liabilities, expenses, costs and obligations of any kind[.]"[70] The Indemnification Agreement remained in effect after the SPA closed.[71]

The Heyman Defendants argue that the disputed off-site liabilities were included in the Indemnification Agreement. Further, the Haymen Defendants argue that LPH is an express intended third-party beneficiary. So, LPH is entitled to indemnification from Ashland. Ashland argues that LPH was never an intended beneficiary, and has no standing.

In Delaware, "intended third-party beneficiaries have a right to enforce a contract which confers a benefit to them. To qualify, 'not only is it necessary that performance of contract confer benefit upon third-parties that was intended, but the conferring of a beneficial effect on such third-party . . . should be a material part of the contract's purpose.'"[72] There is none here for LPH. Article 2.2(a)(1) suggests that GAF would indemnify any future representatives or affiliates. There is no counterpart in Article 2.2(b)(1). The contract reads that ISP would indemnify GAF and its respective affiliates. There is no future-looking language. LPH was

---

[67] *Id.* at 7 (emphasis added).
[68] *Id.* at 3.
[69] *Id.* at 4.
[70] *Id.*
[71] *See id.* Ex. 3 Sections 1.1(a).
[72] *RHA Constr., Inc. v. Scott Eng'g, Inc.,* 2011 WL 3908765, at *5 (Del. Super. Sept. 1, 2011).

17

created after the SPA closed as an entity that would own the Linden Property. LPH is, for lack of a better word, affiliated with the Heyman Defendants and not IES, ISP Holdings, GAF or Ashland. LPH did not exist when the SPA was negotiated and came into existence at or around closing on the SPA. LPH's purported intended-beneficiary claim status is too distant from the Indemnification Agreement's formation and operation.

## V.    CONCLUSION

The Court will **GRANT** the MTD Motion as to Counterclaims I, IV and VI. The Court will **DENY** the MTD Motion as to the remaining Counterclaims.

**IT IS SO ORDERED.**

_____
Eric M. Davis, Judge